*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

No. 12-CF-2047

CHARLES M. COATES, APPELLANT,

v.

UNITED STATES, APPELLEE.

Appeal from the Superior Court
of the District of Columbia
(CF1-7379-11)

(Hon. William M. Jackson, Trial Judge)

(Argued:  December 10, 2014 　　　　　　　　Decided:  April 23, 2015)

*Daniel Gonen*, Public Defender Service, with whom *James Klein*, *Samia Fam*, and *Sonam Henderson*, Public Defender Service, were on the briefs, for appellant.

*John Cummings*, Assistant United States Attorney, with whom *Ronald C. Machen Jr.*, United States Attorney at the time the brief was filed, and *Elizabeth Trosman* and *Michael Liebman*, Assistant United States Attorneys, were on the brief, for appellee.

Before GLICKMAN and FISHER, *Associate Judges*, and RUIZ, *Senior Judge*.

GLICKMAN, *Associate Judge*:  On trial for murder, appellant Charles Coates admitted having shot and killed his cousin and close friend Eddie Leonard, but claimed he did so unintentionally and in self-defense when Leonard, freaking out

on PCP, threatened him with a gun. The key witness against appellant—the government's only witness capable of disputing his account of the shooting—was a jailhouse informant, who testified that appellant confessed to killing Leonard, not in self-defense, but in a fight over the proceeds of a robbery they committed. Appellant denied having confessed to this, but the jury, evidently crediting the informant's testimony, found him guilty of second-degree murder while armed, possession of a firearm during a crime of violence, and other related firearm offenses.

In a trial that pitted appellant's credibility against that of the informant, appellant claims the trial court made two erroneous evidentiary rulings that unfairly skewed the contest against him. First, appellant argues that the court violated his Sixth Amendment right of confrontation by precluding him from impeaching the informant with evidence of his bias—specifically, evidence implying the informant had corruptly fabricated a murder confession by an innocent man in another case in order to curry favor with the government. Second, appellant contends the court also erred in allowing the prosecutor to impeach his (appellant's) veracity by introducing extrinsic evidence of his prior uncharged misconduct—specifically, his statement to police that he had committed what he called "trick" robberies factually unrelated to the charges in this case.

We agree with appellant that each of these rulings was erroneous, and that the ruling limiting his ability to establish the informant's corruption bias cannot be deemed harmless. We therefore vacate appellant's convictions and remand for a new trial.[1]

## I.

The evidence at trial established that the decedent, Eddie Leonard, left his father's house in Southeast Washington, D.C., around 11:30 p.m. on the night of February 20, 2011, to meet up with appellant and another man. Leonard and appellant were cousins. Witnesses described the two men as very close friends who frequently hung out together. On this occasion, Leonard was carrying his .380 pistol with him. By appellant's own account, he and Leonard planned to rob the man accompanying them, who was a PCP dealer.[2]

---

[1] Although the harmfulness of the first erroneous ruling suffices by itself to entitle appellant to a new trial, we consider whether the second ruling also was erroneous because otherwise the issue likely will arise again when the case is retried. It is unnecessary, however, for us to consider whether the second error was prejudicial.

[2] Two voicemail messages from appellant on Leonard's phone confirmed the presence of a third man. In the first message, left at 11:26 p.m., appellant said, "Come out before this MF changes his mind," and in the second message, at 11:31 p.m., appellant said, "I got the bama with me."

Within fifteen to twenty minutes, Leonard was lying dead in an alley in Northeast Washington, D.C. He was killed by a single gunshot to his head, fired at close range from his own pistol.[3] A toxicology report concluded that Leonard had ingested PCP within six hours of his death. Other than appellant, there were no eyewitnesses to the killing.[4]

Around 4:30 a.m. the next morning, appellant arrived at his mother's house, sweating and crying. He asked his mother to call the police and tell them he had information about Leonard's death. Appellant told his family members and the detectives who interviewed him that Leonard was shot by a drug dealer. His accounts of how that happened were inconsistent. Ultimately, though, appellant stated to the police that he and Leonard tried to rob a PCP dealer (the person who was with appellant when Leonard joined them); that Leonard drew his gun and attempted to shoot the dealer but the gun failed to fire; and that the dealer then pulled out his own gun and shot Leonard.

---

[3] The murder weapon was not recovered. A .380 shell casing found in the alley matched the ammunition at Leonard's father's house.

[4] Two people living nearby heard the gunshot at approximately 11:45 p.m. and saw Leonard's body in the alley; one of them also saw a man walk out of the alley. He could not identify this person.

The parties agree that appellant's stories of Leonard having been shot by a drug dealer were fabrications. The government and appellant disagreed at trial as to what actually occurred.

The government's theory of the case was that appellant and Leonard robbed someone, possibly a drug dealer, and that appellant afterwards shot Leonard in a dispute over how to divide up the proceeds between them. The evidentiary basis for this theory was the uncorroborated testimony of a self-described jailhouse informant named Robert Bethea. Bethea, who was 37 years old at the time of trial, had a lengthy criminal record and had spent most of his adult life in prison.[5] He had acted as a government informant and witness in seven different homicide cases (including this one). In exchange for his cooperation, he had received numerous benefits, including the dismissal or reduction of charges, sentencing concessions, and tens of thousands of dollars in housing and living expenses through the witness protection program. "If I'm going to put my life on the line, yeah, there's got to be some benefits," Bethea testified. "[I]f I'm going to provide information, I'm going to receive something in return." Bethea insisted, though, that "receiv[ing]

---

[5] The jury was informed that Bethea was convicted of cocaine possession in 1992 and again in 1994; robbery in 1993; escape in 1999; contempt in 2000; assault in 2004; and distribution of heroin in 2011.

something in return" was not his only reason for serving as a government informant: "I'm cooperating because of the benefits of cooperating," he stated, "and because, also, it's the right thing to do. You're talking about murder." On cross-examination, Bethea readily admitted that he was "not the most honest guy in the world," that he had committed "a lot" of crimes, and that if he were caught, he would lie about what he had done to "weasel out of it."[6] However, Bethea was adamant that he was "always truthful" and "very honest" when he provided information about a murder committed by someone else. He would lie about his own misconduct to get out of trouble, he said, but "for me to sit and lie on somebody else to where it can cost them their whole life, never."

Bethea claimed he earned appellant's confidence while the two were locked up together following appellant's arrest in this case. Initially, Bethea testified, appellant told him the same story he had told his family and police—that Leonard was shot by a drug dealer in a robbery gone awry. Eventually, however, after a number of conversations on the subject and some prodding by Bethea, appellant confessed his own involvement in the shooting: "What [appellant] said," Bethea

---

[6] Bethea also acknowledged having given apparently false testimony when asked about his nickname in his 2000 trial on drug charges, though he explained that his answer was not dishonest, but reflected how he understood the question.

testified, "was that him and his cousin went on a robbery, they got the money, got away and then his cousin be tripping off the PCP . . . and they got to arguing about some money. Then he said he—he said, yeah." Prompted to elaborate, Bethea continued:

> I said, you keep telling me that some other guy shot your cousin, this and that. I said, man, I think you did it. And then that's when he just came out smiling and he said, yeah, man, we were on the move,[7] man, we got the money. Once we came back he be tripping off the [PCP] and, yeah. And he had a smile on his face. And I just looked at him and that's when I knew that . . . [h]e killed his cousin.

Apart from Bethea's testimony, the government presented no evidence that appellant killed Leonard in an argument over the proceeds of a robbery, or even that there was a robbery or a dispute of any kind between appellant and Leonard.[8] Thus, Bethea's testimony about appellant's confession to a murder was the linchpin of the government's case; the jury had to believe Bethea to convict appellant.

---

[7] "On the move" meant committing robbery or "some type of crime."

[8] The trial court granted appellant's motion for a judgment of acquittal on the charge of robbery at the close of the government's case.

Testifying in his own defense, appellant denied having spoken with Bethea about his case and gave a different account of Leonard's death. According to appellant, on the night of the shooting, he and Leonard planned to rob a PCP dealer known to him as "Little Bob." Outside Leonard's father's house, they got into Little Bob's car and drove off, on the pretext that they were going to consummate a large purchase of PCP. On the way, Little Bob allowed Leonard to smoke a PCP-laced cigarette to test the drug before they paid for it. After doing so, however, Leonard unexpectedly became agitated and started rocking back and forth in his seat, stomping his feet, and violently hitting the dashboard, "like the car was closing in on him." Apparently alarmed by Leonard's behavior, Little Bob stopped the car, jumped out, and fled. Leonard also got out of the car and staggered down an alley. Appellant followed him and tried to calm him down and lead him away, but Leonard, getting more and more out of control, pulled out his gun and pointed it at appellant. Appellant attempted to wrest the gun away. A struggle ensued until the gun went off and Leonard fell to the ground, mortally wounded.

Claiming he was in shock at this turn of events, appellant testified that he wandered out of the alley and walked a few blocks before sitting down on some steps to try to recover. Realizing he still had the gun, he abandoned it on the steps, left the area, and returned to his mother's house. Appellant admitted that the

stories he told his family and the police about the shooting were lies; he was in denial and still in shock, he explained.

Appellant's account was corroborated by the toxicological evidence confirming that Leonard had ingested PCP, and by the voicemails indicating that they were with a third person just before the shooting. But "Little Bob," who supposedly saw Leonard become agitated, did not appear as a witness; and no one other than appellant saw the shooting. Thus, appellant's credibility was essential to his defense.

## II.

The rulings challenged in this appeal concerned each side's effort to impeach the other side's most important witness at trial. One ruling thwarted appellant's effort to show Bethea's corruption and bias with evidence that he had made a false report of a confession in another murder case. The other ruling allowed the government to attack appellant's veracity with extrinsic evidence of prior misconduct for which appellant had not been convicted. We address these rulings in turn.

### A. The Limitation on the Impeachment of Bethea with Evidence of Corruption Bias

Prior to trial, the government informed appellant of potential impeachment evidence suggesting Bethea had made a false report of a murder confession in another, unrelated case. In 2009, Bethea claimed that a fellow jail inmate named Travis Freeman confessed to having shot and killed his cousin, Ryan Collins. Bethea turned over to the government a hand-drawn map, which he said Freeman had given him to show where he had buried the murder weapon. Freeman denied Bethea's report. Moreover, because Freeman was incarcerated when Collins was murdered, he could not have committed the homicide or hidden the murder weapon. Freeman was never charged with Collins's murder.

Having commendably disclosed this potential impeachment evidence, the government nonetheless moved to exclude any mention of it at appellant's trial on the ground that it was collateral. Appellant disagreed, arguing that it was strong evidence Bethea had lied about Freeman's confession and manufactured false evidence, demonstrating not only the untruthfulness, but also the corruption and bias of the government's key witness. The ensuing colloquy between the court and counsel over appellant's right to explore these issues at trial extended over three days. Initially, appellant argued somewhat more narrowly that he was entitled to

explore whether Bethea made a false report of a murder confession because it was a prior bad act that bore directly on Bethea's veracity with respect to the issues involved in the trial.[9] Under this rationale, appellant could have cross-examined Bethea about the falsity of his report, but he would not have been allowed to prove its falsity with extrinsic evidence.[10] Appellant eventually broadened his argument, however, to make clear that he sought to use the falsity of the report of Freeman's confession to establish Bethea's corruption and consequent bias.[11] Because bias is not a collateral issue, "evidence from which the jury can infer bias may be presented not only through cross-examination, but also by the introduction of extrinsic evidence."[12]

The trial court agreed that "the centrality of Mr. Bethea in this case is apparent" and that the falsity of his claim that Freeman had confessed to a murder, if shown, would be probative of his bias. The court accordingly allowed appellant to cross-examine Bethea about his report of Freeman's confession and map, to call

---

[9] *See Sherer v. United States*, 470 A.2d 732, 738 (D.C. 1983).

[10] *Id.*

[11] *See Longus v. United States*, 52 A.3d 836, 852 (D.C. 2012) (citing, *inter alia*, *In re C.B.N.*, 499 A.2d 1215, 1219 (D.C. 1985)).

[12] *Id.*

Freeman as a defense witness to deny having made the confession or the map, and to present other evidence (if it existed) showing that Bethea could not have heard what he claimed.[13]

Yet even though the government was willing to stipulate that it was physically impossible for Freeman to have committed the murder to which he supposedly confessed, the court refused to permit appellant to present such a stipulation or otherwise prove that Freeman did not kill his cousin.[14] The court reasoned that Freeman's actual innocence was "irrelevant" to whether he had confessed the murder to Bethea, because it did not "negate" the possibility that he "could have said it." Freeman, the court hypothesized, could have been boasting about a crime he did not commit in order to bolster his reputation at the jail. "People brag all the time," the court observed, for "any number of different reasons."[15] Appellant argued that while Freeman's undisputed innocence may not

---

[13] The court envisaged the possibility that evidence Bethea and Freeman were never together at the Jail "obviously . . . would disprove" Bethea's claim. No such evidence was presented, however.

[14] The government's willingness to stipulate laid to rest any worry, which the court entertained initially, that an inquiry into whether Freeman killed Collins would metastasize into a "mini-trial" that might confuse and distract the jury.

[15] As the court elaborated:

*(continued…)*

have made it literally impossible that he confessed the murder to Bethea, it certainly made it a lot less likely and made Freeman's denial of Bethea's report a lot more credible. "The idea that someone would confess to a crime that they didn't commit is so counterintuitive," appellant pointed out, "that we've made an exception to the hearsay rule. . . . [S]omeone wouldn't say it, if it weren't true." But the court was not persuaded by this argument.

The court's restrictive ruling clearly hobbled appellant's impeachment of Bethea. On cross-examination, Bethea testified that when he and Freeman were incarcerated together in the fall of 2009, Freeman told him he had killed Collins and buried the gun he used to do it. To test whether Freeman's story was true, Bethea said, he asked Freeman to draw a map showing where he secreted the murder weapon. Freeman complied with this request. Bethea reported this information and provided the map to prosecutors. Bethea testified he heard nothing back from them about the case and therefore surmised Freeman "probably

---

*(continued…)*

> I suspect that people in the jail may boast about any number of different things that are not true, precisely because jail's a dangerous place. People get hurt. And so people may very well admit to—oh, I've shot people. I've done this. I'm the baddest person on the block. I'm in this gang, [etc.], because there's a lot of bravado there.

was lying." On redirect, though, Bethea elaborated on the circumstances of Freeman's confession, recalling that Freeman originally blamed someone else for Collins's murder before he finally "broke down" one night under Bethea's prodding and admitted to it—all of which suggested that Freeman was not lying at all when he allegedly confessed.

In the defense case, appellant called Travis Freeman to the witness stand. Freeman testified that his cousin was killed in a robbery attempt. He denied knowing Bethea, telling him he had killed Collins and buried the murder weapon, or drawing a map showing where the gun was hidden. Freeman confirmed that he was never charged with the homicide. However, he was prevented from testifying that he could not possibly have killed Collins or secreted the gun because he was in custody at the time.[16] On cross-examination, the prosecutor elicited Freeman's acknowledgement that he was familiar with the area of First and Ingraham Streets Northwest and then confronted him with a hand-drawn map of that area. Freeman denied having drawn it.

---

[16] When Freeman was asked whether he ever drew anyone a map showing where he had buried the gun used to kill Collins, he began his answer by saying, "No. That's impossible, sir, because I was in—," and the court sustained the government's objection and cut him off.

In its rebuttal case, the government recalled Bethea to the stand. Over appellant's objection, Bethea identified the map the prosecutor had shown Freeman as the same one Freeman had drawn for him. Bethea explained that he was able to convince Freeman to draw it by offering to help him retrieve the gun he had buried. The map was admitted in evidence (again, over appellant's objection).[17] In view of this rebuttal evidence, appellant renewed his request for permission to call Freeman to testify that he could not have killed Collins or buried the murder weapon because he was in custody at the time. Adhering to its prior ruling that the evidence was irrelevant, the court denied the request.[18]

Bethea thus came through this attempted bias impeachment unscathed. Not having heard that Freeman indisputably did not kill Collins or bury the murder weapon, and having seen the map Freeman allegedly drew, the jury had no reason to believe Freeman, or to disbelieve Bethea's testimony and perceive him to be a

---

[17] While the map was produced in court, nothing established that Freeman drew it other than Bethea's word. Nor was there evidence that a gun was found in the hiding place shown on the map.

[18] In doing so, the court again raised the specter of "a mini-trial over whether or not Mr. Freeman did a murder or paid anyone to do a murder." But the government was prepared to stipulate that Freeman did not commit the murder, and it never proffered anything to support the speculation that Freeman hired someone to kill Collins.

corrupt informant who would fabricate the confession of an innocent man and manufacture incriminating evidence. In closing argument, the government thus was well able to argue that Bethea was a trustworthy informant with a good track record; that "[t]he reason he continues to sell information and the reason people buy it still is because it can be credited"; and that Bethea "doesn't like murderers, and he is very pleased to tell the government [when] people who are charged with murder admit their crimes to him, people like this defendant." And in response to appellant's crippled suggestion that Freeman's testimony showed otherwise, the government in rebuttal was poised to dismiss it out of hand, by arguing as follows:

> Mr. Freeman is the person who denies to you that he ever said he killed anybody, to Robert Bethea or anyone else. Is anyone surprised about that? Is anyone surprised that Mr. Freeman didn't get on the stand and say, [w]ell, actually, yeah, I [did] tell Robert Bethea back in 2009 that I killed somebody. . . . That would have been a jaw-dropping moment for Travis Freeman to get on the stand and say, yeah, I did admit to killing a guy, yeah. . . . No one expected that to happen. Of course, it didn't happen. . . . There's no way Mr. Freeman was going to admit that he confessed to a murder. But he does know that area [described in the map]. He did admit that, doesn't he?

This would have been a difficult argument to make if the jury had learned that it was physically impossible for Freeman to have killed Collins.[19]

We are persuaded it was reversible error to preclude appellant from introducing a stipulation or other evidence that Freeman could not and did not commit the murder to which he allegedly confessed. Freeman was relevant to this case only if he did not confess to Bethea. His unquestioned innocence of the murder was the strongest evidence that he did not confess. There was no sound justification for depriving the jury of this pertinent information.

Extrinsic evidence showing Bethea fabricated his report of Freeman's confession was admissible (as the trial court recognized) because it was probative not merely of his lack of veracity, but of his corruption—his "willingness to

---

[19] Appellant intimates in his briefs that to the extent the government's rebuttal argument implied Freeman could have been guilty of his cousin's murder, it was misleading (citing *Woodard v. United States*, 56 A.3d 125, 128 (D.C. 2012) ("[A] prosecutor's misleading statements during closing argument, especially rebuttal argument, may 'so infect [] [a] trial with unfairness as to make the resulting conviction a denial of due process.'") (quoting *Darden v. Wainwright*, 477 U.S. 168, 181 (1986))). Appellant did not object to the argument on this ground at trial, however, nor does he directly assert on appeal that the trial court erred by failing to take corrective action *sua sponte*. We therefore refrain from determining whether the argument was improper or, if so, whether appellant would be entitled to relief for that reason.

obstruct the discovery of the truth by manufacturing or suppressing testimony" or otherwise "to thwart the ascertainment of truth in a judicial proceeding."[20] Such corruption is acknowledged to be a distinct form of testimonial bias.[21] And because the bias of a witness is always a proper subject of inquiry, in a criminal case "[a] trial court's refusal to allow questioning [by the defendant] about facts indicative of a witness's bias from which the jury could reasonably draw adverse inferences of reliability is an error of constitutional dimension"[22]—specifically, a violation of the defendant's Sixth Amendment right of confrontation. While that right is "subject to reasonable limits imposed at the discretion of the trial judge,"[23] the exercise of such discretion "cannot justify a curtailment which keeps from the jury relevant and important facts bearing on the trustworthiness of crucial testimony."[24]

---

[20] *Longus*, 52 A.3d at 852 (quoting, respectively, *In re C.B.N.*, 499 A.2d at 1219, and (*Reginald*) *Bennett v. United States*, 763 A.2d 1117, 1123 (D.C. 2000)); *see also id.*, 52 A.3d at 853-54 n.29 ("[W]e wish to lay to rest any suggestion that 'prior bad acts' of the witness are not admissible in bias examination.").

[21] *Id.* at 852.

[22] *Id.* (internal quotation marks and brackets omitted).

[23] *Scull v. United States*, 564 A.2d 1161, 1164 (D.C. 1989).

[24] (*Jerry*) *Bennett v. United States*, 797 A.2d 1251, 1257 (D.C. 2002) (internal quotation marks omitted).

The trial court in this case was familiar with the foregoing principles and undertook to apply them properly. The court's error was in deeming Freeman's uncontested innocence of Collins's murder to be irrelevant to the question of Bethea's corruption bias because it did not prove conclusively that Bethea fabricated Freeman's confession. This set the bar too high. "The probativity threshold for purposes of admissibility is low: An item of evidence, to be relevant, need only 'tend[] to make the existence or nonexistence of a fact more or less probable than would be the case without that evidence.'"[25] The evidence that it was physically impossible for Freeman to have killed his cousin or buried the murder weapon easily met this test, for, as a rule, "we believe that it is unlikely that a rational person would admit to a crime if it were not true."[26] Nor is it implausible that a jailhouse informant would, in order to curry favor with the government or for other personal motives, lie about a fellow inmate having confessed.[27] Thus, the proffered evidence of Freeman's undeniable innocence certainly would have

---

[25] *In re L.C.*, 92 A.3d 290, 297 (D.C. 2014) (quoting *Punch v. United States*, 377 A.2d 1353, 1358 (D.C. 1977)).

[26] *Laumer v. United States*, 409 A.2d 190, 197 (D.C. 1979) (en banc).

[27] "The likelihood that evidence gathered by self-interested jailhouse informants may be false cannot be ignored." *Kansas v. Ventris*, 556 U.S. 586, 597 n.2 (2009) (Stevens, J. dissenting). *See, e.g.*, Hon. Stephen S. Trott, *Words of Warning for Prosecutors Using Criminals as Witnesses*, 47 HASTINGS L. J. 1381, 1394 (1996) ("The most dangerous informer of all is the jailhouse snitch who

*(continued…)*

helped appellant "establish the . . . improbability"[28] of Bethea's testimony that Freeman "broke down," admitted killing his cousin, and drew Bethea a map showing where he hid the gun he used to commit the homicide. The mere conjecture by the court that Freeman was boasting of a crime he did not commit, which in point of fact was inconsistent with Bethea's account,[29] was not a proper ground on which to exclude the evidence of Freeman's factual innocence as irrelevant. "[E]vidence may not be rejected as irrelevant merely because it is

---

*(continued…)*
claims another prisoner has confessed to him. The snitch now stands ready to testify in return for some consideration in his own case. Sometimes these snitches tell the truth, but more often they invent testimony and stray details out of the air[.]"); *Jackson v. Brown*, 513 F.3d 1057, 1077-78 (9th Cir. 2008) (explaining that "promises of assistance . . . gave [two jailhouse informants] a strong incentive to lie about exactly that part of the testimony that was most crucial to" the charged offense); *Zappulla v. New York*, 391 F.3d 462, 470 n.3 (2d Cir. 2004) (quoting authorities observing that jailhouse informants' "testimony is oftentimes partially or completely fabricated") (citations omitted); *United States v. Cervantes-Pacheco*, 826 F.2d 310, 315 (5th Cir. 1987) ("It is difficult to imagine a greater motivation to lie than the inducement of a reduced sentence."); *United States v. Meinster*, 619 F.2d 1041, 1044-45 (4th Cir. 1980) ("We think it obvious that promises of immunity or leniency premised on cooperation in a particular case may provide a strong inducement to falsify in that case."); *United States v. Alexander*, 430 F.2d 904, 906 (D.C. Cir. 1970) (describing prisoner affidavits stating that appellant's deceased accomplice had confessed as "inherently incredible").

[28] *In re L.C.*, 92 A.3d at 298 (quoting *Plummer v. United States*, 813 A.2d 182, 188-89 (D.C. 2002)).

[29] Bethea's description of Freeman's reluctant confession was a far cry from the boastful posturing the court imagined.

contradicted by other evidence,"[30] let alone because it is contrary to a theoretically plausible but factually unsubstantiated speculation.

The excluded evidence of Freeman's innocence was far from cumulative of other evidence demonstrating Bethea's corruption bias. To be sure, Bethea's credibility was impeached in other ways (for example, by his ironically candid admission that he would lie about his own wrongdoing to get out of trouble), and there was ample evidence of his motive to curry favor with the government. But impeachment of a witness's credibility is not a substitute for bias impeachment, and we have recognized that "the allowance of some examination for one type of bias (currying favor with the government) does not satisfy the Sixth Amendment with respect to cross-examination for corruption, a different type of bias."[31] None of this other impeachment evidence made a serious dent in the government's argument that it was in Bethea's self-interest to provide only truthful reports as a government informant and that he had a sterling track record of doing so. While appellant could still attempt to make a corruption bias argument, none of this other

---

[30] *In re L.C.*, 92 A.3d at 298.

[31] *Longus*, 52 A.3d at 52.

evidence of his motive to curry favor and lack of veracity directly showed that Bethea was corrupt in the sense we use the term here.

Without the excluded evidence of Freeman's innocence, the jury thus had little or no reason to credit his uncorroborated denial of Bethea's testimony about him, and therefore little or no reason to conclude that Bethea was in fact motivated to manufacture incriminating evidence against appellant. If anything, the effect of the court's ruling was to render the testimony concerning Freeman a distracting sideshow that ended up *bolstering* the credibility of Bethea's assertion that he would never lie about someone having admitted to a murder. But if the jury had known Freeman could not possibly have committed the murder, it might well have credited his denial and believed that Bethea had lied and manufactured falsely incriminating evidence in his case. Bethea's corruption bias then would have been manifest, and the jury would have had ample reason to distrust his report of appellant's confession. We have recognized in the past that "[i]f a witness is willing to lie about a murder, a jury may well conclude that she is likely to be willing to lie about anything. More particularly, if she has lied about one murder, there may be little if any reason to credit her testimony about a different murder."[32]

---

[32] (*Jerry*) *Bennett*, 797 A.2d at 1255-56.

Apart from its mistaken relevance determination, the trial court had no other sound reason to exclude the evidence of Freeman's innocence. The only other concern the court identified—the risk of a mini-trial on the issue that might distract and confuse the jury—was dispelled by the government's stated willingness to stipulate that Freeman did not commit the murder of his cousin. There would have been no mini-trial, and no attendant risk of jury confusion.

On appeal, the government argues that appellant did not have a constitutional right to confront Bethea about Freeman because his factual proffer did not "show convincingly" that Bethea had lied about Freeman's confession. This argument misapprehends the nature of the impeachment here. We have said that where a defendant seeks to present evidence of a witness's prior false claim in order to impeach the witness's credibility but not to prove his testimonial bias in the case at bar, "the confrontation clause mandates that the trial court give [the] defendant leave to examine about the prior claim only where it is 'shown convincingly' that the prior claim is false."[33] Here, however, the impeachment of Bethea was for bias. In order to be constitutionally entitled to pursue a line of bias

---

[33] *Garibay v. United States*, 72 A.3d 133, 138 (D.C. 2013) (quoting *Roundtree v. United States*, 581 A.2d 315, 321 (D.C. 1990)); *see also Sherer v. United States*, 470 A.2d 732, 738-39 (D.C. 1983).

inquiry, a party need only "proffer 'some facts which support a genuine belief' that the witness is biased in the manner asserted"[34] or, lacking such facts, at least "a 'well-reasoned suspicion' [of bias] rather than 'an improbable flight of fancy.'"[35] This standard is more lenient than the "shown convincingly" standard for general credibility impeachment with prior false claims, and it unquestionably was satisfied here by Freeman's denial that he had confessed to a murder and the government's acknowledgment that Freeman could not have committed it.

We hold that, by withholding from the jury "relevant and important facts bearing on the trustworthiness of crucial testimony,"[36] the trial court's ruling violated appellant's Sixth Amendment right to confront the witnesses against him. Given the centrality of Bethea's testimony to the government's case against appellant, the absence of evidence corroborating Bethea's report of appellant's confession, and the uniqueness and potential value of evidence demonstrative of

---

[34] (*Irving*) *Jones v. United States*, 516 A.2d 513, 517 (D.C. 1986) (citation omitted).

[35] (*Rocky*) *Brown v. United States*, 683 A.2d 118, 125 (D.C. 1996) (quoting *Scull v. United States*, 564 A.2d 1161, 1164 (D.C. 1989)); *see also Clayborne v. United States*, 751 A.2d 956, 963 (D.C. 2000) (counsel must proffer a "well-grounded" basis that the inquiry will be "probative of bias.").

[36] (*Jerry) Bennett*, 797 A.2d at 1257.

Bethea's corrupt willingness to fabricate false evidence of guilt in a murder case, we cannot find the constitutional error harmless beyond a reasonable doubt.[37] Appellant is entitled to a new trial on this ground.

**B.  The Impeachment of Appellant's Veracity With Extrinsic Evidence of Prior Uncharged Misconduct**

The second challenged ruling allowed the government to introduce appellant's videotaped admission of prior uncharged misconduct—what appellant referred to as "trick" robberies—for the purpose of attacking his character for truthfulness.  We agree with appellant that this ruling was erroneous.

During his interrogation by police, appellant denied having robbed anyone with his cousin Leonard and explained his own preferred *modus operandi* as follows:

---

[37] *See Delaware v. Van Arsdall*, 475 U.S. 673, 684 (1986) ("The correct inquiry is whether, assuming that the damaging potential of the [impeachment] were fully realized, a reviewing court might nonetheless say that the error was harmless beyond a reasonable doubt."); (*Emmett*) *Jones v. United States*, 853 A.2d 146, 154 (D.C. 2004) ("To show harmlessness beyond a reasonable doubt, the government must show that (1) appellant would have been convicted without the witness's testimony, or (2) the restricted line of questioning would not have weakened the impact of the witness's testimony.").

> You know . . . usually I try to get a flip in, but when you got something sweet, he know I don't do nothing but sweet rob—I ain't never robbed nobody with a gun. . . . I do trick robbery. I talk you out your money. You know what I'm saying? Act like I'm doing this and I'm doing this, and I'm getting you. But all the—I do trick robbery.

Over appellant's objection, the trial court allowed the government to introduce these statements in its case-in-chief because they would help the jury evaluate appellant's veracity when (as was anticipated from the defense opening statement) he later took the stand. The court explained:

> It seems to me that he's basically saying his weapon, if anything, is his mouth. He basically is a con person. He talks you out of your money. And if that portion is to be credited, it's probative of whether or not, it seems to me, his in-court testimony is to be credited by that jury on whether or not he's, quote, unquote, conning them, as he says he does in this particular statement[.]

In other words, the court stated, appellant's statements were admissible to show that he was not "a truth teller."

When appellant did take the stand and testify, the government did not cross-examine him about his "trick robberies" statement. But at the trial's conclusion, the prosecutor ended his rebuttal argument by reminding the jury of appellant's admission that "[h]e was a trickster" and telling the jury that appellant "was trying to trick you when he got on the stand."

Allowing the government to introduce appellant's "trick robbery" admissions in evidence and use them to attack his truthfulness as a witness was improper. Appellant's "trick robberies" were prior bad acts, and his recorded out-of-court statements to the police constituted extrinsic evidence of those acts. As this court explained in *Sherer*, under our case law it is impermissible to impeach a witness's truthfulness with extrinsic evidence of prior bad acts that did not result in a criminal conviction:

> The general credibility of a witness can be impeached by evidence that the witness has been convicted of a [felony], or of a crime involving dishonesty or false statement. The conviction can be established either through cross-examination or by extrinsic evidence.
>
> In contrast, a witness may be cross-examined on a prior bad act that has not resulted in a criminal conviction only where: (1) the examiner has a factual predicate for such question, and (2) the bad act bears directly upon the veracity of the witness in respect to the issues involved [in] the trial. Moreover, where such impeachment is permitted, evidence of the prior misconduct may be elicited only by cross-examination of the witness; it may not be proved by extrinsic evidence.[38]

_____

[38] *Sherer*, 470 A.2d at 738 (internal quotation marks and citations omitted); *see also* (*James*) *Brown v. United States*, 726 A.2d 149, 153 (D.C. 1999) ("Prior bad acts not rising to the level of a criminal conviction . . . cannot be proven by extrinsic evidence."); D.C. Code § 14-305 (b)(1) (providing that "for the purpose of attacking the credibility of a witness, evidence that the witness has been convicted of a criminal offense shall be admitted if offered, either upon the cross-examination of the witness or by evidence aliunde. . . .").

We have recognized no exception to this rule where the extrinsic proof of the prior misconduct consists of the witness's out-of-court admissions.[39]

The government argues that appellant's statements about committing trick robberies were admissible as false statements evincing his consciousness of guilt.[40] However, that was not the basis on which the court admitted appellant's statements, nor was it how the government used them. The government argued that appellant's trick robbery claims were *true*, not false, and that they showed his *dishonesty*, not his consciousness of guilt.

At his new trial, this extrinsic evidence of prior uncharged misconduct may not be admitted to attack appellant's veracity.

---

[39] *Cf. United States v. Shinderman*, 515 F.3d 5, 18 (1st Cir. 2008) (explaining that extrinsic evidence of prior misconduct to prove a witness's untruthfulness is prohibited by Federal Rule of Evidence 608 (b) even if the witness admits the misconduct).

[40] *See Nelson v. United States*, 601 A.2d 582, 595 (D.C. 1991) ("[A] false statement made by a defendant in explanation of conduct which is the subject of criminal charges against him is admissible as tending to show consciousness of guilt.").

**III.**

For the foregoing reasons, we vacate appellant's convictions and remand for a new trial.

*So ordered.*