# District of Columbia Court of Appeals

**No. 15-CF-677**

SHAWN SMITH,

Appellant,

v.

UNITED STATES,

Appellee.



FILED

March 8, 2018

DISTRICT OF COLUMBIA
COURT OF APPEALS

CF2-8362-14

On Appeal from the Superior Court of the District of Columbia

Before THOMPSON and MCLEESE, *Associate Judges*, and FERREN,[*] *Senior Judge.*

## J U D G M E N T

This case came to be heard on the transcript of record, the briefs filed, and was argued by counsel. On consideration whereof, and as set forth in the opinion filed this date, it is now hereby

ORDERED and ADJUDGED that the trial court's judgment is affirmed.

For the Court:

*Julio A. Castillo*

JULIO A. CASTILLO
Clerk of the Court

Dated: March 8, 2018.

Opinion by Senior Judge John M. Ferren.

Opinion concurring in the judgment by Associate Judge Phyllis D. Thompson.

Dissenting opinion by Associate Judge Roy McLeese.

---

[*] Senior Judge Belson was originally assigned to this case. Following his retirement on July 24, 2017, Senior Judge Ferren was assigned to take his place on the division.

*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

No. 15-CF-677

SHAWN SMITH, APPELLANT,

v.

UNITED STATES, APPELLEE.

FILED **03/08/2018**
District of Columbia
Court of Appeals

*[signature]*
Julio Castillo
Clerk of Court

Appeal from the Superior Court
of the District of Columbia
(CF2-8362-14)

(Hon. Anita Josey-Herring, Trial Judge)

(Argued January 24, 2017                Decided March 8, 2018)

*William Collins*, Public Defender Service, with whom *Samia Fam*, *Jonathan Anderson*, and *Jaclyn Frankfurt*, Public Defender Service, were on the brief, for appellant.

*Peter S. Smith*, Assistant United States Attorney, with whom *Channing D. Phillips*, United States Attorney at the time the briefs were filed, and *Elizabeth Trosman* and *Laura Crane*, Assistant United States Attorneys, were on the brief, for appellee.

Before THOMPSON and MCLEESE, *Associate Judges*, and FERREN,[*] *Senior Judge.*

---

[*] Senior Judge Belson was originally assigned to this case. Following his retirement on July 24, 2017, Senior Judge Ferren was assigned to take his place on the division.

Opinion for the court by *Senior Judge* FERREN.

Opinion concurring in the judgment by *Associate Judge* THOMPSON, at page 53.

Dissenting opinion by *Associate Judge* MCLEESE, at page 57.

FERREN, *Senior Judge*: Appellant, Shawn Smith, was convicted of carrying a pistol outside of his home or place of business,[1] unlawful possession of a firearm by a former felon,[2] possession of an unregistered firearm,[3] and possession of a large capacity ammunition feeding device.[4] He appeals his convictions, arguing for reversal on several grounds:

(1) The trial court violated his Sixth Amendment right to cross-examine the arresting police officer on a theory of "corruption bias."

(2) The trial court erred by precluding impeachment of the officer after he "falsely and repeatedly" testified that he had been "attacked and acted in self-defense" when striking a crime scene observer.

---

[1] D.C. Code § 22-4504 (a)(2) (2001).

[2] D.C. Code § 22-4503 (a)(1) (2001).

[3] D.C. Code § 7-2502.01 (a) (2001).

[4] D.C. Code § 7-2506.1 (b) (2001).

(3) The government's delayed and incomplete mid-trial disclosure of the officer's pending excessive force investigation in another case violated appellant's due process rights under *Brady v. Maryland*,[5] warranting reversal.

For the reasons that follow, we affirm.

## I. Facts and Proceedings

### A. Events at Issue

According to the government's evidence, at approximately 1:00 a.m. on May 11, 2014, officers of the Seventh District Metropolitan Police Department ("MPD") observed a dozen or so individuals walking along 13th Street, S.E. toward Alabama Avenue. As Officers Damien Williams and Terry Couch left their vehicle "to see what was going on," a man later identified as appellant Smith turned and began to run down the street into an alley near Savannah Street, S.E. The officers ran after Smith, who was holding his waistband while running. As Smith passed a wooden fence enclosing a yard near the alley, he pulled what "clearly" appeared to be a black semiautomatic handgun from his waistband and

---

[5] 373 U.S. 83 (1963).

tossed it over the wooden fence into the yard. At the time Smith discarded the handgun, Officer Couch was approximately five to six feet behind him, followed closely by Officer Williams. Both officers described the area as "dimly lit" with streetlights.

As Officer Couch continued to pursue Smith, Officer Williams stopped to search for the discarded handgun. Upon entering the yard, Williams located a handgun lying in the grass approximately six feet from the fence. He observed a small indentation in the ground where the handgun appeared to have landed, as well as dirt on the handgun's barrel. The handgun was also dry compared to the surrounding area, which was wet from recent rain. Rather than contact crime-scene personnel to process the area, Officer Williams photographed the handgun using his cellular phone. He then put on gloves to recover it, placed it in an evidence bag, and transported it to the police station. The parties stipulated that no fingerprints were discovered on the handgun and that DNA testing was inconclusive.

While Officer Williams was recovering the handgun, Officer Couch continued to pursue Smith on foot and caught up to him about a block from where the handgun was discovered. Officer Couch explained that as they crossed over

13th Street, S.E. in a sprint, Smith "tripped, fell, [or] stopped," causing them both to fall. The officer then handcuffed Smith and transported him to the hospital. Eventually, Smith was charged.

## B. The Trial

Before swearing in the jury on December 17, 2014, the trial judge asked the parties whether there were any preliminary matters that warranted the court's attention. Both responded that there were none, whereupon each made opening statements to the jury. The government then requested a bench conference. At the bench, the government disclosed that its key witness, Officer Williams, was under investigation by the United States Attorney's Office for using "excessive force" against a bystander, Antwann Barkley, in an unrelated incident ("Barkley incident") that took place on December 1, 2014, almost seven months after the incident at issue here. The judge ordered the government to present its second witness (Officer Couch) first and held over discussion of the issues derived from the government's delayed disclosure until after Couch had testified. During a break in testimony, the prosecutor indicated that she had learned of the pending investigation a day or two earlier; that there was "no report" because the investigation was still "open"; and that there were "no documents" related to the investigation.

After a second break in Couch's testimony, however, the prosecutor discovered a preliminary Internal Affairs Division ("IAD") report about the pending investigation, which she produced. It was dated eight days earlier, December 9, 2014, based on a referral to the U.S. Attorney's office on the day it happened, December 1. This "preliminary" document (hereafter the "IAD report") summarized the Barkley incident, as follows: On December 1, 2014, Officer Williams responded to a radio run for a homicide in the 2400 block of Elvans Road, S.E. While responding, Officer Williams and another officer saw a Chevrolet Impala collide with a lamp post near the scene of the homicide. After Williams and a colleague removed the occupants from the Impala, the officers began to secure the perimeter with crime scene tape. While doing so, the officers asked a group of bystanders, including Barkley, to leave the area. The group responded by shouting obscenities at the officers and advising the officers that they had their hands up "like Michael Brown."[6] Eventually the bystanders, except for Barkley, moved away from the scene.

---

[6] Michael Brown was the young African-American man killed by police in Ferguson, Missouri on August 9, 2014.

Officer Williams continued to order Barkley to move back, but Barkley instead placed his cell phone in Officer Williams's face. In the words of the report, "Officer Williams then tried to physically push Mr. Barkley back." Barkley responded, the report continued, "by jumping back and trying to strike Officer Williams with his fist." But Officer Williams "delivered a single, straight strike to Mr. Barkley's face, causing him to fall over backwards and strike his head on the ground." Barkley was then transported to the hospital, discharged with a broken jaw, and charged with two counts of assault on a police officer (one for assaulting Officer Williams, the other for assaulting another officer at the scene, Michael Johnson). Officer Williams's excessive force case was then transferred to the United States Attorney's Office.

Attached to the IAD report were statements from three police officers, a civilian witness, and Barkley. These statements, in a few respects, were inconsistent with each other and with the IAD report itself concerning who had initiated physical contact, Barkley or Williams, and, in particular, whether Barkley had made threatening gestures to Officer Williams before the officer's "straight strike."

Based on the IAD report, defense counsel moved for "a dismissal — a mistrial. . . . [T]his is *Brady*."[7] Counsel stressed that, had he received timely disclosure of the IAD information, his investigation of the case and, perforce, his cross-examination of Officer Couch "would have been different." The trial court agreed that the government had withheld evidence favorable to the defense and that its disclosure had been untimely under *Brady*. The court, however, rejected dismissal or a mistrial because the defense had received the IAD report, and any prejudice from the delayed disclosure would be "mitigated by the fact that [Officer Williams] . . . hasn't testified, can be crossed, and the defense can make use of this [delayed disclosure] during the course of the trial." Therefore, concluded the court, the "failure to disclose" would not be "outcome determinative here" (the result required for a *Brady* violation).[8]

The next day, after the court denied a motion the government had filed for reconsideration of its *Brady* ruling, defense co-counsel informed the court that overnight the defense had learned from Barkley's attorney about a "cell phone

---

[7] *See Brady*, 373 U.S. 83.

[8] *See* (*Herbert*) *Brooks v. United States*, 396 A.2d 200, 204 (D.C. 1978) ("[I]nformation is material if it tends to be outcome-determinative of the case").

video of the event." The defense also had become aware that the *Gerstein*[9] affidavit that Officer Williams had filed to support Barkley's arrest was "not completely consistent with the IAD report." In particular, counsel proffered that Barkley's attorney had told him, contrary to the officer's affidavit, that Barkley "was not in a fighting position" toward Williams. And, added counsel, there was an issue "about whether or not [Williams] lied in the *Gerstein* application" and about whether other officers "colluded in the lies."

The trial court again denied counsel's request for *Brady* sanctions, ruling that it would not dismiss, grant a mistrial, or even "continue the case." The court limited cross-examination to (1) the fact that Officer Williams had an investigation "pending against him," including the "underlying facts and circumstances"; (2) the "nature of the allegation"; and (3) any potential consequences of the investigation. Later, however, having announced that defense counsel could cross-examine about the "underlying facts and circumstances" of the Barkley incident, the court narrowed that permission by precluding cross-examination about the "underlying details" of that incident — the ruling that presents the central issue in this appeal.

---

[9] *Gerstein v. Pugh*, 420 U.S. 103 (1975).

The jury found Smith guilty of all four charges, and the court sentenced him to twenty-four months of incarceration. He subsequently filed a motion for a new trial pursuant to Super. Ct. Crim. R. 33, asserting among other things that the trial court had erroneously precluded him from cross-examining Officer Williams on a "corruption bias" theory (referring to alleged falsities in Officer Williams's *Gerstein* affidavit). The trial court denied the motion, noting that it had allowed counsel to pursue a "mostly speculative" corruption bias theory and that "there was not sufficient evidence to support a claim of corruption bias beyond the questioning permitted by the [c]ourt." Referring to appellant's argument that he had not been able to "conduct a meaningful impeachment" of Officer Williams with respect to inconsistencies between the *Gerstein* and statements by other witnesses to the Barkley incident, the court observed that this was "essentially the same argument the defendant made at trial" and that the "[c]ourt does not find, on this record, [that] the arguments advanced by defense counsel established a basis for cross-examination on the issue of corruption bias."

## II. Cross-Examination for Corruption Bias

Smith contends, first, that the trial court violated his Sixth Amendment right to cross-examine Officer Williams on a theory of "corruption bias," discernible from the officer's false testimony under oath about the Barkley incident. The

government responds that Smith did not adequately raise at trial, and thus preserve for our review, the corruption bias theory he asserts on appeal.

## A. The Right of Confrontation

The Confrontation Clause of the Sixth Amendment "guarantees a defendant in a criminal case the right to confront witnesses 'against him.'"[10] Inherent in this right is the opportunity to cross-examine witnesses for bias,[11] "a broad term that may refer both to a witness'[s] personal bias for or against a party and to his or her motive to lie."[12] Although the trial court has "discretion to control the extent of cross-examination[,] . . . [t]hat broad discretion cannot . . . justify a curtailment which keeps from the jury relevant and important facts bearing on the trustworthiness of crucial testimony."[13] Moreover, "[c]ross-examination

---

[10] *Longus v. United States*, 52 A.3d 836, 849 (D.C. 2012) (quoting U.S. CONST. amend. VI).

[11] *See In re C.B.N.*, 499 A.2d 1215, 1218 (D.C. 1985).

[12] *Coles v. United States*, 36 A.3d 352, 358 (D.C. 2012) (quoting *McCloud v. United States*, 781 A.2d 744, 752 (D.C. 2001)) (citation and internal quotation marks omitted).

[13] *In re C.B.N.*, 499 A.2d at 1218 (citations and internal quotation marks omitted).

concerning bias is particularly important where, as here, the credibility of the key government witness is the central factor to be weighed by the trier of fact."[14] Thus, "[a] trial court's refusal to allow questioning about facts indicative of [a witness's] bias from which the jury could reasonably draw adverse inferences of reliability is an error of constitutional dimension."[15] Furthermore, a defense effort to demonstrate bias is not limited to cross-examination. Because bias is "not a collateral issue," a defendant may "introduce extrinsic evidence,"[16] including witnesses and documents, to establish it.

### B. Smith's Allegation of Corruption Bias

Seeking clarification of the defense effort to cross-examine Officer Williams, the trial court first, as background for discussion, expressed at length its understanding of our *Longus* decision[17] explaining "corruption bias" — more

---

[14] *Id.* (citing *Davis v. Alaska*, 415 U.S. 308, 317 (1974)).

[15] *Longus*, 52 A.3d at 852 (quoting *Cunningham v. United States*, 974 A.2d 240, 245 (D.C. 2009)) (internal quotation marks omitted).

[16] *In re C.B.N.*, 499 A.2d at 1218 (citation and internal quotation marks omitted).

[17] *See Longus*, 52 A.3d 836.

specifically, "a distinct subset of bias evidence"[18] demonstrating "a willingness to give false testimony."[19] Next, because defense counsel had stressed that he would have cross-examined Officer Couch differently if he had first learned about the Barkley incident, the court asked how the "pending investigation involving Officer Williams" would have affected counsel's approach to the Officer's colleague, Couch. Defense counsel replied that he could have brought out "collusion," that is, "how the officers protect each other" — how they "get together" and "prepare their story." He referenced not only Couch[20] but also statements of the other police witnesses attached to the IAD report. Counsel added that he was also seeking to demonstrate Williams's effort to "curry favor" with the prosecution.

Later that day, however, in a written response to the government's motion for reconsideration of the court's *Brady* ruling that the Barkley disclosure had been untimely, defense counsel clarified that, in alleging collusion, the defense was fundamentally asserting corruption: "If Officer Williams lied about the incident, and colluded with his fellow officers to support his false version, then he corrupted

---

[18] *Id.* at 852 (citation omitted).

[19] *Vaughn v. United States¸* 93 A.3d 1237, 1266 n.33 (D.C. 2014).

[20] Officer Couch was not present at the Barkley incident but was mentioned, presumably, as a corrupt colluder at Smith's trial.

the judicial process."[21]  More specifically, claimed counsel, witness statements in the IAD report and, potentially, Barkley's cell phone video of the event possessed by Barkley's attorney, were "not consistent with the police version."

In disputing Smith's first contention on appeal — the alleged unconstitutional limitation on defense counsel's cross-examination of Officer Williams for corruption bias — the government maintains that the trial court did not err for three reasons:  (1) defense counsel never attempted to cross-examine Officer Williams "about alleged false statements in the *Gerstein* affidavit" (which the trial court "never precluded"); (2) counsel made mere "passing references" to discrepancies in the *Gerstein* affidavit while arguing, instead, a "collusion bias" theory at trial;[22] and (3) counsel proffered only "minor inconsistencies" among Officer Williams's trial testimony, his *Gerstein* affidavit, and the witness statements attached to the IAD report, thus failing to proffer the foundation — at

---

[21]  The defense response cited one of our "corruption bias" decisions, *In re C.B.N.*, 499 A.2d at 1219 (The "essential discrediting element is a willingness to obstruct the discovery of the truth by manufacturing or suppressing testimony") (citation omitted).

[22]  According to the government's understanding, and ours as well, Smith's "collusion bias" theory was premised on alleged evidence that police officers, who (he says) commonly cover for each other, colluded with Officer Williams in lies — "all made up [of] almost exactly the same statement" in the IAD report — about how the Barkley incident (and Williams's role in it) unfolded.

least a "well-reasoned suspicion" — required to justify cross-examination for corruption bias.[23]  We consider each in turn.

**1.**

The government's first argument is misleading.  Defense counsel sought to test the accuracy of Officer Williams's *Gerstein* affidavit by reference to allegedly contrary testimony by police and other witnesses to the Barkley incident.  Thus, he established on cross-examination that Williams was under investigation for an alleged "serious use of force" in another case, and that Williams had "issued a straight strike in defense of myself against [Barkley]" meaning a "jab" that is justified when "someone comes to attack you and they raise their hands." Counsel then attempted to ask Officer Williams on cross-examination whether "the individual that you hit . . . had his hands up."  The trial court, however, immediately sustained the government's objection to the question, reminding counsel that he could go into "the nature of the incident" but not "the underlying details."  Counsel protested, in vain, that he had information from Barkley's attorney that Barkley "had his hands up" in surrender mode; "he was not in a fighting position."  Contrary to the government's representation, therefore, this left

---

[23] *Coates v. United States*, 113 A.3d 564, 575 (D.C. 2015).

little, if any, room for counsel to cross-examine Officer Williams about allegedly false statements in the *Gerstein* affidavit.

**2.**

The government's second contention also fails. The government suggests (without insisting) that collusion bias and corruption bias — a bias not premised on cooperation with others — are distinct forms of bias, and that the corruption theory was not raised at trial. The differences between the two, however, are not as dissimilar as the government apparently would have it. "Collusion" bias presupposes "[a]n agreement to defraud another or to do or obtain something forbidden by law,"[24] whereas "corruption" bias can be merely an individual's "willingness to give false testimony"[25] — a "willingness to obstruct the discovery of the truth."[26] Both, however, can permeate trial testimony and, by hiding the truth, corrupt the judicial process. The fact that more than one actor participates in

---

[24] *Collusion*, BLACK'S LAW DICTIONARY (10th ed. 2014) (defining "collusion"). "The use of dictionary definitions is appropriate in interpreting undefined statutory terms." *West End Tenants Ass'n v. George Washington Univ.*, 640 A.2d 718, 727 (D.C. 1994) (citation omitted).

[25] *Vaughn*, 93 A.3d at 1266 n.33.

[26] *Coates*, 113 A.3d at 572 (footnote omitted).

collusion bias cannot negate the corrupt mentality of each participant who, as a colluder, seeks to do something "forbidden by law" — in this case obstruct discovery of the truth. In the present trial context, therefore, corruption bias can be understood as a subset of alleged collusion bias.

In any event, not only did defense counsel argue at trial that Officer Williams had "corrupted the judicial process,"[27] but also the trial court itself, in denying Smith's motion for a new trial, acknowledged that it "did allow counsel to pursue a corruption bias theory[,] although the theory was mostly speculative." Accordingly, contrary to the government's argument, Smith's theory of the case presented on appeal had been raised at trial, albeit unsuccessfully.

**3.**

**a. The Issue**

We consider, finally, the government's only substantive objection to the proffered corruption bias: Given only "minor inconsistencies" between Officer Williams's *Gerstein* affidavit and the witness statements attached to the IAD

---

[27] See *supra* note 21 and accompanying text.

report, the defense did not make a "proffer of corruption bias" sufficient to justify a ruling that Smith's Sixth Amendment confrontation right had been violated.

Smith sought to demonstrate, through cross-examination, that Officer Williams had "lied in his *Gerstein* affidavit" — evidence that Williams would make "false claims under oath in order to justify arrests and criminal charges." Counsel proposed to do so, as we have noted, by showing material inconsistencies (including omissions) between the *Gerstein* affidavit and witness statements in the IAD report and, potentially, evidence in Barkley's cell phone video possessed by his attorney.[28]

Before pursuing a particular line of corruption bias questioning, "a defendant must lay a foundation sufficient to permit the trial judge to evaluate whether the proposed question is probative of bias."[29] To lay that foundation, defense counsel must proffer "some facts which support a genuine belief that the witness is biased in the manner asserted or, lacking such facts, *at least a well-reasoned suspicion* [of

---

[28] Smith also maintains that the trial court's refusal to permit him to sufficiently pursue corruption bias was not harmless error under *Chapman v. California*, 386 U.S. 18, 24 (1967) ("harmless beyond a reasonable doubt").

[29] *Blades v. United States*, 25 A.3d 39, 42-43 (D.C. 2011) (citations omitted).

bias] rather than an improbable flight of fancy."[30] "At a minimum, this would . . . require that the questioner [ ] support any proposal for cross-examination with a credible statement describing the suspected cause of bias in the witness, supported by plausible factual allegations or itself plausible within the framework of facts that neither party has contested."[31] A trial court, however, "does not abuse its discretion by precluding cross-examination where the connection between the facts cited by defense counsel and the proposed line of questioning is too speculative to support the questions."[32]

## b. The Defense Proffers

In this case, after a brief continuance granted to the government to file for reconsideration of the trial court's *Brady* ruling, defense counsel sought to show

---

[30] *Coates*, 113 A.3d at 575 (emphasis added) (brackets in original) (footnotes and internal quotation marks omitted). *See also Clayborne v. United States*, 751 A.2d 956, 963 (D.C. 2000) ("The examiner must have a reasonable factual foundation, such as the credible report of another witness or one's client, or at least a 'well-reasoned suspicion' that the circumstances indicating bias might be true.").

[31] *Melendez v. United States*, 10 A.3d 147, 152 (D.C. 2010) (alteration and brackets in original) (citations and internal quotation marks omitted).

[32] *Brown v. United States*, 683 A.2d 118, 125 (D.C. 1996) (brackets, citation, and internal quotation marks omitted).

Smith's corruption bias through three proffers, one written, two oral. In his written proffer,[33] defense counsel stressed that the *Gerstein* affidavit omitted any reference to the fact that Barkley had been "filming . . . the event" on his cell phone; that his "video [was] not consistent with the police version that Mr. Barkley dropped the phone to assume a fighting pose"; and that although civilian witnesses were present "filming the scene," none had been interviewed and apparently their cell phone footage was not available. Later, in his first oral proffer, defense counsel pointed out that in Officer Williams's *Gerstein* affidavit, he had laid out facts that were contradicted by other witnesses to that incident cited in the IAD report — facts that were likely revealed in video footage from Barkley's cell phone apparently possessed by the U.S. Attorney's office. During further proceedings, Smith's counsel added a second oral proffer by informing the court (as noted above) that Barkley's attorney had told him that Barkley "was not in a fighting position" toward Williams, thereby directly contradicting the *Gerstein* affidavit. Counsel then noted that, in addition to Barkley's cell phone video, which he "believe[d] the U.S. Attorney's office" possessed, there was also "another video . . . out there somewhere in the world."

---

[33] This proffer is contained in Smith's reply to the government's motion to reconsider the trial court's ruling that the mid-trial *Brady* disclosure of the pending investigation of Officer Williams was untimely.

Limited by these proffers, we must conclude that the trial court did not err in precluding Smith's proposed line of corruption bias questioning, for he failed to proffer facts sufficient to support the required "well-reasoned suspicion" that Officer Williams falsified his *Gerstein* affidavit, the predicate for Smith's contention.

We consider, first, the referenced cell phone videos. Defense counsel initially appears to have understood from Barkley's attorney that there was a film of virtually the entire Barkley-Williams encounter — a film he continued to believe was "somewhere out in the world." By the time counsel filed Smith's response to the government's motion to reconsider the *Brady* ruling, however, counsel had narrowed his focus to Barkley's own cell phone video, apparently recognizing and accepting the unavailability of cell phones that other witnesses may have been using to film the ruckus. Smith therefore relied exclusively on Barkley's cell phone (which he believed the U.S. Attorney's office possessed) for evidence that Barkley had not assumed a fighting stance before Officer Williams delivered the strike that felled him.

In his *Gerstein* affidavit, Officer Williams averred that Barkley's "fist" had been "above his chest" in an "aggressive fighting stance" before Officer Williams

delivered the straight strike. The IAD report is consistent with that statement; it concluded that, when Williams ordered Barkley to "back up," Barkley had "plac[ed] his cell phone directly in Officer Williams' face," whereupon Williams tried to "push Barkley back," then Barkley "tried to strike Officer Williams with his fist," at which point the officer struck Barkley. Barkley's own statement attached to the IAD report adds little; he asserted that he had been "videotaping the crash" when the "phone was knocked out of [his] hand." In this fast-moving situation, it is not clear exactly when or how the phone left Barkley's hand. But even if we assume that Barkley was holding it just before he got hit, there is little indication that Barkley could have video-photographed both himself and Officer Williams sufficiently to confirm Smith's contention that the officer had lied because Barkley's hands were *not* up in an "aggressive fighting stance" immediately before Williams struck him (as stated in the *Gerstein* affidavit).

We turn, next, to Smith's contentions comparing the *Gerstein* affidavit with the IAD report. There were, indeed, inconsistencies between the *Gerstein* affidavit and witness accounts of the incident in the IAD report, particularly regarding whether Officer Williams initially pushed Barkley and whether Barkley's hands were up in surrender mode or in a fighting stance at the time Officer Williams struck him. But those proffered inconsistencies were not enough to generate a

"well-reasoned suspicion" that Officer Williams, through his *Gerstein* affidavit, was corrupt — was intentionally "thwart[ing] the ascertainment of truth."[34]

In the *Gerstein* affidavit, Officer Williams stated under oath (where relevant here):

> [1] Officer Williams in a loud clear voice instructed Defendant Barkley to move down the sidewalk once more but he did not comply. [2] Officer Williams began to redirect Defendant Barkley from the crime scene when he began shoving Officer Williams. [3] Officer Williams issued several loud verbal commands to Defendant Barkley to stop and that he was pushing an Officer [Johnson]. [4] Defendant Barkley then took an [sic] aggressive fighting stance, placing his left foot forward, bawled his hands into fists and placed them above his chest[;] his elbows were bent at a forty-five degree angle, as he began to step toward Officer Williams again. [5] Officer Williams, fearing he was about to be struck by Defendant Barkley issued a straight [sic] strike to Defendant Barkley. [6] Defendant Barkley fell to the ground and was placed into handcuffs. [7] Defendant Barkley was subsequently placed under arrest for APO [assault on a police officer] and transported to Howard Hospital by Ambulance . . . .

The IAD report of the same transaction stated in relevant part:

---

[34] *See Coates*, 113 A.3d at 572 (footnote omitted).

> [1] All the men except Mr. Barkley moved back. Mr. Barkley continued to shout . . ., stating that he had his hands up and he was not moving. [2] Officer Williams continued to order Mr. Barkley to back up, [3] at which time, Mr. Barkley responded by placing his cell phone directly in Officer Williams' face. [4] Officer Williams ordered Mr. Barkley to move the phone out of his face, but Mr. Barkley did not comply. [5] Officer Williams then tried to physically push Mr. Barkley back, [6] who responded by jumping back and trying to strike Officer Williams with his fist. [7] Officer Williams then delivered a single strike to Mr. Barkley's face, [8] causing him to fall over backwards and strike his head on the ground.

Antwann Barkley added two statements that were attached to the IAD report.

> [1] I was trying to film and an officer smacked my phone out of my hand. [2] After that an unknown person punched me in my face [3] knocking me to the ground[;] [4] my hands were up when this happened.

> I were videotaping the crash with my left hand up[;] my phone was knocked out of my hand and I were punched from the back side . . . . Don't remember anymore.

The IAD report also included statements from four witnesses: three police officers and one civilian — statements we shall compare with the *Gerstein* affidavit to discern, if possible, the evidence of corruption bias that Smith alleges. Like the government, we perceive only minor inconsistencies, not larger differences, among the *Gerstein* affidavit, the IAD report, and the eyewitness

statements. The comparisons do not manifest discernible lies, let alone corruption bias, attributable to Officer Williams.

*First*, the *Gerstein* affidavit said that Officer Williams "instructed" Barkley to leave the scene. Similarly, the IAD report and all three officers said, respectively, that Williams "tried to guide," "directed," and "order[ed]" Barkley to leave — no obviously rough treatment at the outset of the confrontation. The civilian witness made no comparable assessment.

*Second*, as to what followed next, in the *Gerstein* affidavit Officer Williams averred that Barkley "began shoving" him. Similarly, one officer stated that, initially, Barkley tried to "push hard" on Williams. To the contrary, the IAD report said that, after Barkley failed to comply with Officer Williams's order to remove the phone from his face, Williams was the first to "physically push" Barkley. Moreover, another officer also said that initially Williams "began to push" Barkley. The third officer and the civilian witness did not comment about the first "shove" or "push."

*Third*, the *Gerstein* affidavit averred that when Barkley "began shoving" Williams, the officer "began to redirect" (meaning push)[35] Barkley from the crime scene and commanded Barkley to stop pushing a colleague (Officer Johnson). Barkley then assumed an "aggressive fighting stance" toward Williams (described in detail), whereupon Williams, in fear, "issued a straight strike" that knocked Barkley to the ground. The IAD report — stating that Williams, not Barkley, initiated physical contact — added that when Williams tried to "physically push" Barkley, Barkley tried to "strike Officer Williams with his fist," whereupon Williams "delivered a single strike" to Barkley's face, causing Barkley to fall to the ground. In addition, a civilian witness, as well as two of the three officers, all stated that Barkley acted from a "fighting stance," "an aggressive stance," "balled . . . fists." The third officer referred only to Barkley's "movement." The IAD report did not say that Barkley had assumed an "aggressive" or "fighting" stance, but it did conclude that Barkley was "jumping back," meaning "back" at Williams, before "trying to strike" the officer (who thereafter felled Barkley).

---

[35] Ostensibly, "redirect" seems rather benign. However, we learned from the transcript of Officer Williams's testimony at Barkley's later (2015) trial for assaulting Officers Williams and Johnson that in police-speak "redirect" means "push." Appellant Smith filed an unopposed motion to supplement the record on appeal with the *Gerstein* affidavit and the Barkley trial transcript.

## c. The Law

Although the "well-reasoned suspicion" standard does not require defense counsel to prove that the factual allegations proffered are true,[36] counsel must proffer more than minor sequential inconsistencies stated by different individuals whose varied perceptions of a single frenzied event may well differ.[37] Such differing accounts do not necessarily indicate that someone is lying or, without more, show corruption, the bias that Smith asserts. This conclusion is particularly justified when evaluated with reference to our corruption bias case law explaining when a proffer has been deemed sufficient.

---

[36] *Brown*, 683 A.2d at 125 ("[A] proffer is nothing more than an offer to prove factual allegations, and does not consist of their proof itself.").

[37] It is interesting to note that eleven months later, when Barkley was acquitted at his trial for assaulting two police officers (Williams and Johnson), the trial judge called the scene "very chaotic. . . . There were many people. There were a number of officers." In particular, "Officer Williams was really focused on what he thought was [a] potential homicide investigation, that maybe people involved in this crash were witnesses, or involved in a homicide, and that was his focus. He had gotten these people out of the car. He had handcuffed them. He was trying to secure them, and so, his focus was, although he may have been concerned about the other officers in cordoning off the scene, his focus really was to maintain the status quo until the homicide detectives arrive[d]."

For example, in *Longus*,[38] a murder case, we discerned reversible Sixth Amendment error in the trial court's refusal to allow cross-examination and "extrinsic evidence" tending to prove the corruption bias of a police witness who, according to a newspaper account proffered by counsel — which the government had conceded was "not inaccurate" — had allegedly coached witnesses to change their stories in another homicide case and was under suspension and investigation for "witness coaching."[39] In *Coates*,[40] we reversed a murder conviction because of a trial court ruling that denied the defense an opportunity to present "[e]xtrinsic evidence" that an "informant had corruptly fabricated a murder confession by an innocent man in another case in order to curry favor with the government."[41] And in *In re C.B.N.*,[42] we reversed an adjudication of armed robbery after the trial court had refused a defense proffer of "extrinsic evidence" tending to prove that the government's only identification witness had blackmailed other boys at the scene

---

[38] *Longus*, 52 A.3d 836.

[39] *Id.* at 852-53.

[40] *Coates*, 113 A.3d 564.

[41] *Id.* at 566-67.

[42] *In re C.B.N.*, 499 A.2d 1215.

of the robbery by saying that "he would give testimony that would get them all in trouble" unless they gave him money.[43]

These decisions addressing alleged bias appropriately considered defense-proffered reliance on extrinsic evidence indicating corruption — a "propensity or willingness" to lie.[44] That is to say, they presuppose extrinsic evidence "probative not merely of [the witness's] lack of veracity, but of his corruption — his willingness to obstruct the discovery of the truth by manufacturing or suppressing testimony or otherwise to thwart the ascertainment of truth in a judicial proceeding."[45]

The defense proffers in the present case do not reach this "propensity or willingness" threshold, a hurdle that can only be surmounted by a proffer of evidence, extrinsic to the case, tending to demonstrate that the witness is likely a

---

[43] *Id.* at 1217.

[44] *Longus*, 52 A.3d at 852 (quoting *Bennett v. United States*, 763 A.2d 1117, 1123 (D.C. 2000)). *See Vaughn v. United States*, 93 A.3d 1237, 1266 n.33 (D.C. 2014) ("willingness to give false testimony"); *In re C.B.N.*, 499 A.2d at 1219 ("willingness to lie upon the stand").

[45] *Coates*, 113 A.3d at 572 (footnote and internal quotation marks omitted).

prevaricator.[46]  The alleged evidence of corruption here, based almost exclusively on the *Gerstein* affidavit and the IAD report with related police and civilian witness statements, is too fuzzy to suggest more than confusion.  Officer Williams's *Gerstein* affidavit and the IAD materials have only three noteworthy differences:  (1) The *Gerstein* indicates that Barkley "shov[ed]" Williams first, whereas the IAD report concludes that Williams "physically push[ed]" Barkley first. (2) The *Gerstein* is silent about Barkley's cell phone, whereas the IAD report states that Barkley placed his cell phone in Williams's face, whereupon the officer tried to push Barkley back when Barkley would not remove the phone.  (3) The *Gerstein* did not mention whether Barkley's hands were up in surrender mode, whereas the IAD stated that Barkley shouted that "he had his hands up" and "was not moving."

Neither the first distinction (while a sharp one) nor the second one is, without more, a manifest indication of bias.  However, the third distinction,

---

[46]  In using the words "extrinsic evidence," we are not suggesting that the evidence must always be admissible at trial in order for the court to find it sufficient to justify the required well-reasoned suspicion; rather, we use those words to represent facts proffered about the witness from information outside the purview of the trial.  This means facts that would satisfy the court that a suspicion of corruption bias was well reasoned and thus warranted cross-examination to that end, leaving it to the court to decide in what manner that information would be conveyed at trial.

focused on the acceleration of events, reflects a more serious issue of intent and possible prevarication. But even if we assume that Barkley's hands were "up" in surrender mode initially, the two police officers and the civilian witness who gave statements about the "strike" by Williams, all supported the IAD conclusion that Barkley had tried "to strike Officer Williams with his fist" before Williams "delivered [his] single strike" to Barkley's jaw. Moreover, in support of that conclusion, the civilian witness, as well as two of the three police officers (the other did not comment), signed statements that, before Williams delivered his strike, Barkley was in an "aggressive" or "fighting" stance.[47]

The differences between the testimony of Officer Williams and the IAD report and witnesses may reflect a dent in the officer's veracity — his credibility — but they do not, without more, give rise to a "well-reasoned suspicion" of a corruption bias against Barkley. Moreover, our conclusion is reinforced by the very absence of the collusion bias that Smith alleges as bedrock evidence of the

---

[47] In addition to Smith's proffer concerning Barkley's cell phone video discussed above, Smith's proffered information from Barkley's attorney — that Barkley "was not in a fighting position" toward Officer Williams — was inadmissible hearsay and in any event belied by both civilian and police IAD witnesses. Finally, Smith's generalized proffer that other civilian witnesses were present merely reflected IAD evidence, without specifics as to what the witnesses would say in addition to statements attached to the IAD report.

alleged corruption.[48] Given several *dissimilar* memories among the police officers in their IAD statements, as well as the *similar* memories of police officers and the civilian witness attesting to Barkley's aggressive stance toward Williams before the officer leveled his single strike, the trial court could reasonably conclude that there was no nefarious collusion here. In sum, absent a sharp and meaningful distinction between Officer Williams's *Gerstein* affidavit and the reported statements of the IAD witnesses about this fast-moving situation, we do not have extrinsic evidence of an established level of prevarication sufficient to support a "well-reasoned suspicion" that Officer Williams had acted corruptly in signing his *Gerstein* affidavit and testifying as he did at trial.

## III. Impeachment of Allegedly False Testimony

Smith contends, next, that the trial court erred in precluding impeachment of Officer Williams after he "falsely and repeatedly" testified that he had been "attacked and acted in self-defense" when striking Barkley.

---

[48] See *supra* part II.B.

In addition to attempting to cross-examine Officer Williams for alleged bias, the defense sought to challenge his veracity. As we have observed earlier,[49] when asked about breaking Barkley's jaw, the officer acknowledged that he had "issued a straight strike in defense of myself against [Barkley]" that caused him to fall to the ground. But, he added, "whether or not the straight strike broke his jaw or the ground did, I don't know." Referring to Barkley, defense counsel then asked Williams: "[T]he individual that you hit, he had his hands up, correct?" The government objected. Counsel replied that Williams had "opened the door" to cross-examination about information, received from Barkley's attorney, "that the guy had his hands up and he was not in a fighting position." Defense counsel, in other words, was attempting to show that the officer was lying — that he had not struck in self-defense. The trial court, however, sustained the government's objection, reminding counsel that he could ask "about the nature of the incident" but not about "the underlying details." The court later signaled, in denying appellant's new-trial motion, that it would not permit a "trial-within-a-trial" of the Barkley incident — a diversion that would likely confuse the jury.[50] Thus, the

---

[49] See *supra* part II.B.1.

[50] *See Hager v. United States*, 791 A.2d 911, 914 (D.C. 2002) ("The trial judge must balance the probative value of the evidence against the risk of prejudicial impact, including the risk of jury confusion from a trial-within-a-trial,

(continued . . .)

court chose to halt an inquiry that seemed headed in that direction. The court advised that counsel could ask Williams about whether he thought the investigation pending against him was "a big deal," and "whether he is [being] investigated for breaking somebody's jaw," but he could not go "into more detail about the events."

On appeal, Smith cites "a rule of evidential parity: once [a party] opens the door to a specific issue, the [opponent] has the right to respond with contrary evidence on the same issue."[51] Thus, says Smith, because Officer Williams attempted to justify his "straight strike" against Barkley as self-defense, Smith's counsel had the right to challenge that testimony through cross-examination.

Ordinarily, Smith's point would be well-taken. Moreover, we are not convinced that the trial court would necessarily have launched a distracting mini-trial by permitting cross-examination on a question about Williams's self-defense claim. In light of that reasonable concern, however, the court might have approached counsel's effort more creatively by permitting a *voir dire* on the issue,

_____

(. . . continued)
and may exclude marginally relevant evidence if it will distract the jury from the issue in this case.") (internal citations and quotation marks omitted).

[51] *Johns v. United States*, 434 A.2d 463, 469 (D.C. 1981).

outside the presence of the jury, to explore appropriate guidelines for how far the questioning might go without generating jury confusion.[52]

On the other hand, even if the court had permitted defense counsel to ask whether Barkley's hands were "up," and Williams answered "yes," he presumably would have explained that "up" meant (in the words of the *Gerstein* affidavit) "an aggressive fighting stance" causing him fear followed by the "straight strike."[53]  A contrary answer — that Barkley's hands were up in surrender mode — would have been at odds with the scenario in Williams's *Gerstein* affidavit and thus unlikely. On the other hand, if, in answering the "hands up" question, Officer Williams were to have acknowledged that, early on, Barkley's hands were up in a benign stance, he presumably would have added a qualifier:  that by the time of the "straight strike," Barkley was standing in attack mode, as several IAD witnesses, police and

---

[52]  *See Shorter v. United States*, 792 A.2d 228, 235 (D.C. 2001) ("[T]he trial court's concern about a mini-trial and jury confusion could have been alleviated through a limited *voir dire* examination outside the presence of the jury, and depending upon the results of the *voir dire*, limited cross-examination of [the complainant] about the . . . alleged incident and her recantation.").

[53]  See *supra* part II.B.3.

civilian, confirmed.[54]  In sum, Smith's argument that the "hands up" question was likely to help the defense amounts to speculation.

Furthermore, the government, in closing argument to the jury, confirmed that, as to his pending investigation, Officer Williams was a resistant witness, and that defense counsel had effectively exposed the officer's equivocal, defensive responses.  Said the prosecutor:

> At first, Mr. Williams — Off. Williams wasn't so sure about what — exactly what the consequences [of his pending investigation] are, and that's pretty surprising, that he may not grasp some of the severity of what's going on.  But when asked on cross-examination about the consequences, he recognized that he could lose his job as an officer of the Metropolitan Police Department; he could face criminal charges for felony assault; and he also could face civil litigation based on the events that occurred in the early morning hours.  Now, the reason that this is all important is because the stakes of that investigation leave you to wonder, is there a reason this officer has to change his testimony here, to testify favorably for the government in this case?  And that's something that you guys are charged with considering when you go back to that jury room.

---

[54]  Perhaps Smith could have argued that, because he was challenging Williams for bias as well as veracity, he could have introduced extrinsic evidence, such as a Barkley witness, in aid of impeachment.  But that would have launched the mini-trial that the trial court was determined, with sound reason, to avoid.

From the government's viewpoint, therefore, defense counsel gave the jury good reason to question Officer Williams's credibility, without regard to whether Barkley's hands may have been "up" in surrender — not in attack mode — when Williams struck him.

Finally, from defense counsel's colloquy with the trial court, it is clear that counsel was pushing for a mini-trial of the Barkley incident, not merely for an answer to the "hands up" question. Adding this dynamic into the mix, we cannot gainsay the trial court's discretionary judgment that setting a Barkley inquiry in motion would likely overwhelm the proceeding with a mini-trial.[55] But even if the trial court should at least have deferred that concern by trying to find a way to test the "hands up" question through a reasonably limited *voir dire* (not heard by the jury), we cannot say, on this record, that there was an abuse of discretion — a discretionary error of a "magnitude to require reversal"[56] — when the court sustained the government's objection to that question. The situation was too fluid, and Barkley's "fighting stance" before the Williams "strike" was too well documented, for us to grant heft to Smith's argument here.

---

[55] *See* (*Markus*) *Johnson v. United States*, 960 A.2d 281, 294 (D.C. 2008) ("The judge must retain full authority to prevent this sort of trial-within-a-trial.") (citation omitted).

## IV. The *Brady* Claim

Relying on *Brady v. Maryland*,[57] Smith maintains that the delayed disclosure

of the Barkley incident violated his right to constitutional due process, warranting

reversal.[58] The government and the trial court agreed with Smith that the incident,

as reported by the IAD, was "bias information." Moreover, the court, quoting

*Vaughn v. United States,* agreed that the information was "potentially useful to the

defense"[59] and, in derogation of *Brady*, had not been "timely provided."[60] The

court concluded, however, that the delayed disclosure was not "material" under

---

(. . . continued)

[56] (*James*) *Johnson v. United States*, 398 A.2d 354, 366 (D.C. 1979).

[57] 373 U.S. 83 (1963).

[58] *See Giglio v. United States*, 405 U.S. 150, 154 (1972) (nondisclosure of impeachment information falls within *Brady* protection).

[59] *See Vaughn*, 93 A.3d at 1254.

[60] *See id.* We have said that, "[t]o determine on appeal whether the government, through its representatives in the trial court, has violated its obligations under *Brady*, we consider: (1) whether the information in question is 'favorable to the accused'; (2) whether this information was possessed and suppressed by the government, 'either willfully or inadvertently'; and (3) whether that information was material, i.e., whether there is 'a reasonable probability that, had the evidence been disclosed, the result of the proceeding would have been different.'" *Id.* (quoting *Miller v. United States*, 14 A.3d 1094, 1109 (D.C. 2011)).

*Brady*[61] — that is, the delay would not be "outcome-determinative."[62] Thus, the court twice denied counsel's requests for dismissal or a mistrial. The court reasoned, as noted earlier, that any prejudice to the defense would be "mitigated" through cross-examination of Officer Williams at trial. That ruling, however, came too quickly.

Although cross-examination of Officer Williams might have mitigated prejudice from late disclosure of the Barkley incident, the defense argument at trial — not sufficiently acknowledged by the court — was that cross-examination for corruption bias would be prejudiced without further investigation of the officer's interactions with Barkley. Thus, the "critical inquiry" here is "whether the tardiness" in disclosing the Barkley incident mid-trial — without opportunity for further investigation — "prevented defense counsel from employing the [*Brady*] material to good effect."[63] Indeed, "[t]he ability to mount an effective cross-examination often is of great significance in delayed disclosure cases involving

---

[61] See *supra* note 60.

[62] (*Herbert*) *Brooks*, 396 A.2d at 204 ("[I]nformation is material if it tends to be outcome-determinative of the case").

[63] *United States v. Perez-Ruiz*, 353 F.3d 1, 8 (1st Cir. 2003) (quoting *United States v. Devin,* 918 F.2d 280, 290 (1st Cir. 1990)).

impeachment evidence."[64]   Understandably, therefore, after denial of defense counsel's first request for a mistrial but before Officer Williams was to testify, counsel asked for "a day" to "digest" the IAD report, a request the court denied on the assumption that counsel would "have some additional time" when trial presumably would be delayed to arrange counsel for Officer Williams.[65]

Rather than pursue a lawyer for Williams, however, the government asked for, and received, a brief continuance, beginning shortly after 2:00 p.m., to prepare a motion for reconsideration of the court's *Brady* ruling, due at 7:00 that evening, before the second day of trial.  Defense counsel was ordered to file a response by 12:00 noon the following day, thereby compressing his time to prepare for cross-examination of Officer Williams and delivery of closing argument.   Smith contends on appeal that if he had received adequate time to investigate the Barkley incident with the benefit of the IAD report — more than the overnight time he had — his "cross-examination of Officer Williams would have been more effective," and he "would have been able to expose Officer Williams' corruption bias."

---

[64]  *Id*. at 9.

[65]  Defense counsel made his request for a continuance, on the first day of trial, before his discovery that evening that Barkley's attorney had a cell phone video of the Barkley incident as well as other information indicating the need for further, substantial investigation.

To be sure, from the moment of the *Brady* disclosure after opening statements to the jury, defense counsel persistently sought time to investigate, process, and use the information contained in the IAD report. Although counsel made only the one explicit request for a "continuance,"[66] he cannot be faulted for not asking for another.[67] There can be no doubt that the court was aware of Smith's desire (after denial of his requested dismissal or a mistrial) to have additional time, both when defense counsel received the IAD report and again after the conversation counsel had with Barkley's attorney, when counsel learned that there were "witnesses in a cell phone video of the event." Counsel also had located Officer Williams's *Gerstein* affidavit, which, he told the court, "was not completely consistent with the IAD report." Based on this new information, counsel again stressed to the court that "Mr. Smith has been denied the right to investigate[,] to figure out how to integrate that [evidence] into his defense."

---

[66] See *supra* note 65 and accompanying text.

[67] *Cf. Miller*, 14 A.3d at 1115 ("[G]iven the judge's view of the case and his comparatively tolerant attitude towards belated disclosures, a motion for a mistrial would surely have been futile, and the law generally does not require the doing of a futile act") (citing *In re Melton*, 597 A.2d 892, 907 (D.C. 1991) (en banc)).

On the second day of trial, in Smith's reply to the government's motion for reconsideration, counsel outlined the investigation he would have conducted had he been provided the information of Officer Williams's pending investigation "in a timely manner." He said that he would have "interviewed the three lay witnesses" identified by Barkley's attorney, viewed the cell phone video "that directly contradicts Officer Williams' account," attempted to locate "any other cell phone video," and "sought copies of the relevant police reports." Moreover, defense counsel represented that the three witnesses whom Barkley's attorney had identified "dispute[d] Officer Williams' and his fellow officers' account[s]" in the *Gerstein* affidavit and the IAD report. Based on defense counsel's submissions, therefore, the trial court was undoubtedly aware that he was pleading for further time to conduct his investigation, but the court ruled *sua sponte* that it would "not continue the case."

All things considered, we must conclude that Smith has preserved, and effectively asserted, a claim that the trial court erred in denying a reasonable mid-trial continuance to explore the potential for relevant evidence of corruption beyond that proffered through the *Gerstein* affidavit and the IAD report. Indeed,

courts regularly favor a mid-trial continuance over a dismissal or mistrial when an untimely *Brady* disclosure can reasonably be remedied in that way.[68]

"We review [a trial court's] decision to deny a continuance for abuse of discretion,"[69] an analysis, first, of alleged error and, if error is found, of alleged prejudice "of a magnitude to require reversal."[70] "A party seeking a continuance must make a showing that it is reasonably necessary for a just determination of the cause."[71] More specifically, "in the delayed disclosure context," there must be, in

---

[68] *See, e.g.*, *United States v. Mota*, 685 F.3d 644, 649 (7th Cir. 2012) ("[W]hen a defendant realizes that exculpatory evidence has been withheld, the appropriate course is to seek a continuance if more time to investigate the exculpatory potential of the evidence is needed") (citations and internal quotation marks omitted); *United States v. Williams*, 95 F.3d 723, 730 (8th Cir. 1996) (finding the district court acted within its discretion in granting defendant a two-week continuance after a *Brady* violation, rather than dismissing the case).

[69] *Perez-Ruiz*, 353 F.3d at 8 (applying abuse of discretion standard to denial of a continuance after delayed disclosure of *Brady/Giglio* material). *See generally Moctar v. United States*, 718 A.2d 1063, 1065 (D.C. 1998) ("As we have repeatedly held, the grant or denial of a continuance rests within the sound discretion of the trial judge, to whom we accord wide latitude.").

[70] (*James*) *Johnson*, 398 A.2d at 366. *Accord Dorsey v. United States*, 154 A.3d 106, 120 (D.C. 2017) (citing *Jones v. United States*, 127 A.3d 1173, 1189 (D.C. 2015)).

[71] *Kyle v. United States*, 759 A.2d 192, 196 n.2 (D.C. 2000) (citations and internal quotation marks omitted).

addition to showing error, "some showing of prejudice beyond mere assertion."[72]

Factors relevant to this two-fold showing include "the reasons for the request for a continuance, the prejudice resulting from its denial, the party's diligence in seeking relief, any lack of good faith, and prejudice to the opposing party."[73] "The trial court also may properly consider the public's interest in the prompt, effective, and efficient administration of justice."[74] Furthermore, because constitutional due process is at issue here, the importance of that right is still another, indeed significant, factor to be considered.

Smith stresses in his brief that if the government had timely disclosed the Barkley incident (as it could have) well before trial,[75] defense counsel could have

---

[72] *Perez-Ruiz*, 353 F.3d at 8. *See Mackabee v. United States*, 29 A.3d 952, 963-64 (D.C. 2011) ("[I]t is not enough for appellant to describe a mere possibility that [the] undisclosed information might have helped the defense, or might have affected the outcome of the trial") (footnote and internal quotation marks omitted).

[73] (*DeAndre*) *Brooks v. United States*, 130 A.3d 952, 960 (D.C. 2016) (quoting *Daley v. United States*, 739 A.2d 814, 817 (D.C. 1999)).

[74] *Id.* (quoting *Leak v. United States*, 757 A.2d 739, 744 (D.C. 2000)) (internal quotation marks omitted).

[75] The Barkley incident was referred to the United States Attorney's Office on the day it happened, December 1, 2014; the IAD report was dated December 9, 2014, and the incident was disclosed to Smith's counsel, along with the report, after opening statements and testimony by the government's first witness on December 17, 2014. Officer Williams testified that he became aware of the

(continued . . .)

"ask[ed] for a continuance" prior to swearing of the jury, "to investigate further and modify the defense theory, opening statement, cross-examination of Officer Williams[,] and closing argument."[76]   The prejudice from the government's delayed disclosure, he asserts, was even greater because Officer Williams was the main prosecution witness.

For reasons we shall explain forthwith, we shall assume, hypothetically, a successful compromise with the trial court that would have allowed Smith, during a mid-trial continuance, a measure of access to Barkley witnesses theretofore barred by the court's protective order.   And, relatedly, we shall assume a satisfactory solution to the court's concern that the proceeding not drift too far into a mini-trial of the Barkley incident.   Even in light of these assumptions, however, as we shall elaborate, Smith's claims of trial court error and prejudice, taken together, ultimately fail to satisfy *Brady*'s materiality requirement.   That is to say, by resolving these issues through assumptions in Smith's favor, and merging those

_____

(. . . continued)

investigation well in advance of trial, believing that he had received notification "three days after it happened."

[76]   *Perez v. United States*, 968 A.2d 39, 66 (D.C. 2009) (This disclosure must be made at such a time as to "allow[] defense counsel an opportunity to investigate the facts of the case and, with the help of the defendant, craft an appropriate defense").

assumptions into the question whether the court's denial of a reasonable continuance would have created a "material" deprivation under *Brady*, we must answer "no." There was no "reasonable probability" that "the result of the proceeding would have been different"[77] if the continuance had been granted and Smith had pursued the midtrial investigation he proffered.

An enhanced pretrial or midtrial investigation building on the *Gerstein* affidavit and the IAD report, when coupled with resourceful cross-examination of Officer Williams, would not have "undermine[d] [our] confidence in the outcome,"[78] for ultimately nothing leads to a conclusion that Smith did not receive a "fair trial."[79] As noted earlier,[80] Smith filed an unopposed motion to supplement the record on appeal with the *Gerstein* affidavit and the two-day transcript from

---

[77] *Vaughn*, 93 A.3d at 1254 (citation omitted). "A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." *United States v. Bagley*, 473 U.S. 667, 682 (1985). Under this standard, a "showing that it is more likely than not the defendant would have been acquitted" is not required. *Vaughn*, 93 A.3d at 1262. Rather, "the materiality threshold is met if, in the absence of proper disclosure, we question whether the defendant received a fair trial and our 'confidence' in the outcome of the trial is thereby 'undermine[d].'" *Id.* (footnote and citation omitted).

[78] *Bagley*, 473 U.S. at 682; *Vaughn*, 93 A.3d at 1263.

[79] *See Bagley*, 473 U.S. at 682; *Vaughn*, 93 A.3d at 1263.

[80] See *supra* note 35 and accompanying text.

Barkley's bench trial. Thereafter, the government sought to remove any reference in its filings that opposed consideration of the Barkley trial. Both parties therefore concur in our reliance on that record for purposes of assessing materiality under *Brady*. To us it is clear that even if, during Smith's trial, his counsel had access to all the testimonial and other evidence admitted during Barkley's trial, we must conclude that Smith's argument for corruption bias by Officer Williams would have failed.

We have already observed that the discrepancies between the *Gerstein* affidavit of Officer Williams and the IAD report (and attendant statements) were insufficient, without more, to generate a "well-reasoned suspicion" that Williams harbored a corruption bias. When we add to those documents the evidence presented in the Barkley proceeding, the totality of the evidence reinforces that conclusion.

In the first place, contrary to defense counsel's surmise, Smith was not prejudiced by counsel's inability to track down Barkley's cell phone video and other video footage for use at trial. According to the judge in the Barkley trial, the "surveillance video from, I assume . . . a pharmacy . . . doesn't really show very

much."[81]  Furthermore, "[w]ith regard to the cell phone video that was recovered from Mr. Barkley, . . . I really don't think it really helps very much in resolving the important issues in this case."  Counsel for Smith does not question those observations.[82]

As to the testimony concerning Barkley's alleged assaults against Officers Williams and Johnson, the judge appeared to credit testimony that Barkley (in the judge's words) told his friends to "keep your hands up so you're not perceived to be a threat to these officers."  Thereafter, according to Officer Williams, he "began to redirect [Barkley]," *i.e.,* "push him back towards the crime scene tape," acknowledging (contrary to his *Gerstein* affidavit) that he pushed Barkley first. The judge then found that, in response to that push, Barkley pushed back. Barkley's response was "not . . . unreasonable," added the judge, because Barkley had "not really [been] doing anything but mouthing off," and Officer Williams "had no right to put his hands on Mr. Barkley or [ ] push him."  Instead, said the judge, the officer should have arrested Barkley "for failure to obey a lawful

---

[81]   As indicated earlier, Smith's counsel had believed that a video of the Barkley encounter in addition to the one in Barkley's cell phone was "out there in the world," but he did not argue that the U.S. Attorney's office had it or assert the importance of finding it for purposes of Smith's trial.

[82]   Neither party provided video footage for the record on appeal.

command." Therefore, concluded the judge, "because the officer . . . was the initial aggressor," and Barkley's response was "reasonable," the judge found Barkley not guilty of APO. The acquittal, therefore, turned on the officer's unreasonably "putting his hands on Mr. Barkley" in the first place, not on an inappropriate direct strike in response to Barkley's "aggressive stance" once the situation had escalated in this "very chaotic scene."[83]

It is important to emphasize that, by the time of Officer Williams's testimony at Barkley's trial, approximately nine months after the present proceeding, he had abandoned his *Gerstein* statement and accepted the finding of the IAD report that he had pushed Barkley before Barkley shoved him. And in further testimony, Williams confirmed that Barkley's followers had "had their hands up, saying Michael Brown, Michael Brown," and that Barkley kept "telling them to keep their hands up" in passive reaction to the police.[84]

---

[83] The trial judge observed that, once Barkley "got into" a "fighting stance," the judge had "no doubt that maybe Officer Williams thought [Barkley] was about to punch him, and maybe [Williams] was completely okay with, you know, giving the straight-line punch."

[84] It is interesting to note that the Barkley trial judge added: "I can say one thing about Officer Williams, he was amazingly honest and, and credible. I found . . . Officer Williams very, very credible in many ways. . . . Sometimes I think the honesty of, and I appreciated it, of Officer Williams may actually have helped the defense case."

Based on the evidence at Barkley's trial, we are convinced that if Smith had been given a reasonable mid-trial continuance to investigate that incident further — including reasonable access to the cell phone and other video evidence in the government's possession, plus reasonable access to cooperative eyewitnesses — there is reason to believe that Smith would have (1) learned that the video material was not likely to help the defense; (2) discovered the essential validity of the IAD report, including evidence that Barkley had faced Officer Williams initially with his hands up; (3) learned that contrary to his *Gerstein* affidavit, Williams acknowledged he had pushed Barkley before Barkley shoved him; and (4) uncovered that — as corroborated by two officer witnesses and a civilian witness — Barkley had "got into a fighting stance" before the officer jabbed him with the "straight strike."

The question whether denial of a continuance here was "material" under *Brady* — creating a "reasonable probability" that further investigation would have led to a different result — is an objective inquiry, not merely a question answerable by reference to how a particular trial judge subjectively would have viewed the matter.[85] Thus, in making that objective analysis, we do not rely on the Barkley

---

[85] *See Bagley v. Lumpkin*, 798 F.2d 1297, 1301 (9th Cir. 1986) ("The proper inquiry is an objective one: whether the Government's failure to . . . disclos[e]

(continued . . .)

judge's credibility findings,[86] which we have included only to provide a complete story of that trial as context for Officer Williams's testimony. Rather, for *Brady* purposes, we rely solely on the officer's responses during that trial to indicate what Smith's counsel presumably would have learned from cross-examination of Officer Williams in this case, if the trial court had permitted it. We are confident that when Officer Williams's Barkley testimony is added to the IAD report and attendant statements, no reasonable factfinder would have found that his testimony in this case reflected corruption bias — a propensity or willingness to lie — that would have led to a different result here. In sum, the trial court did not abuse its discretion in denying a continuance that would have allowed Smith's counsel to investigate further the actions of Officer Williams in the Barkley incident.

_____

(. . . continued)

information that might have been helpful in conducting cross-examination undermines confidence in the outcome of the trial. Therefore, the district judge erred when . . . he stated that the [undisclosed information] would not have affected his decision. The inquiry is not how this or any other judge, as the trier of fact, would subjectively evaluate the evidence. It is, rather, how the absence of the evidence objectively might have affected the outcome of the trial.") (internal citation and quotation marks omitted).

[86] This court has accepted trial court credibility findings during a *Brady* analysis when essential to assessing relevance of facts germane to materiality. *See, e.g.*, *Perez*, 968 A.2d at 72 (in assessing materiality of government's failure to disclose alleged false statements and immigration status of a witness, "[w]e defer[red] to the trial court's credibility determination" that the witness "did not fabricate her trial testimony . . . to curry favor with the government in order to obtain help with her immigration status").

Although, as noted earlier, the court erred in failing to grant a continuance, that error did not result in an "abuse" — an error "of a magnitude to require reversal."[87]

\*\*\*\*\*

For the reasons spelled out above, the judgment of the trial court is

*Affirmed.*

---

[87] (*James*) *Johnson*, 398 A.2d at 366.

THOMPSON, *Associate Judge*, concurring:  I concur in the judgment and also fully concur with Judge Ferren's opinion, except with respect to his conclusion that appellant's "theory of the case presented on appeal [was] raised at trial."  *Ante* at 17.  My review of the record persuades me that the trial court was not adequately apprised that defense counsel was pursuing not just a collusion-bias theory but also a corruption-bias theory as to Officer Williams.  That is another reason why, in my view, the trial court did not err in precluding appellant's proposed line of questioning.

Defense counsel made multiple statements to the court that indicated that counsel wanted to pursue a collusion-bias theory.  For example, on December 18, 2014, when the trial court asked counsel to explain "why a pending investigation involving Off. Williams . . . is related . . . to your ability . . . to raise [a] bias issue," defense counsel said, "First, I think there's an issue of collusion[.]"  Counsel further explained that "the issue is how the officers protect each other" since "they all make similar statements as to what happened, going as far as characterizing [William's punch to Barkley] as a straight punch."  Counsel said that his "overall theme" was that "officers — when you know your [fellow] officer is in trouble and he's under an investigation, these officers get together in collusion and they prepare their story."  Counsel added that "it's about establishing that this

unit, this is what they do when they are faced up against allegations of excessive force," i.e., "in that incident where [an arrestee] was hurt, they all ma[k]e up almost the exact same statement."[1] Counsel told the court that the "other issue" was that Officer Couch had the same motive to curry favor with the U.S. Attorney's Office as Officer Williams had, "because that's his partner." Counsel also said that investigating complaining witness Barkley, the witnesses in the Barkley case, obtaining the video footage, and exploring contradictions with Williams's *Gerstein* "[a]ll . . . would have [gone] to [that] theory."[2]

---

[1] On December 17, too, counsel had asserted to the court that Officer Couch may have "kn[o]w[n]" about Off. Williams's investigation and may have been trying to cover for him." He told the court that he contemplated a "simple bias cross" focused on Couch's possibly "currying favor" on behalf of Williams. Counsel said that with earlier disclosure about the investigation pending against Officer Williams, he might also have "gone down the road that Mr. Williams is actually the person that assaulted Mr. Smith."

[2] Counsel explained that there was "a sworn affidavit that Damien Williams swore to in terms of the Gerstein that he made basically laying out the facts of that underlying case, and . . . there are things that contradict that." Shortly thereafter co-counsel interjected that the issue was "also about whether or not [Williams] lied in the Gerstein application, whether or not the officers that were part of that event on December 1st colluded in the lies." These, co-counsel said, were "core issues of credibility." Co-counsel did not mention corruption bias. The trial court said that it would permit counsel "to set up this theory that . . . Off. Couch cover[ed] up[] because he's partners with . . . Off. Williams[.]" On December 19, appearing to follow up on co-counsel's comments, counsel told the court that he wanted to cross-examine Williams not just as to bias (presumably, collusion bias) but also as to "his veracity as he started to speak about the underlying incident regarding self-

(continued . . .)

During the further proceedings on December 18, 2014, counsel also told the court that Barkley's attorney had told him that Barkley was not in a fighting position. But counsel then went on to argue that the purpose of the questions he wanted to ask Williams about the incident was to establish "the nature of the injuries" Barkley suffered and to show that this was "not just a run-of-the-mill investigation" and not a "big deal." Again, counsel did not say that the purpose was to show that Williams was a corrupt officer.

In appellant's "Reply to Government's Motion to Reconsider" its *Brady* ruling, defense counsel perhaps came close to urging the theory he advances on appeal, but even there the theory was tied to a collusion theory. That pleading asserted, "there is evidence of collusion here. If Officer Williams lied about the incident, *and colluded with his fellow officers to support his false version*, then he has corrupted the judicial process." In the same vein, counsel's pleading emphasized that Williams might be facing charges of aggravated assault or assault with significant bodily injury and stated that Williams's "conduct, and that of his

_____

(. . . continued)
defense." The court responded that there was "sufficient information in the record from which the jury can judge the credibility of this officer."

partner, [was] critical to the defense theory." Defense counsel's presentations never advanced the argument that counsel wanted to cross-examine to establish that Williams gave a false account of what happened during the Barkley incident and, on that basis alone, was shown to be a corrupt cop who was not credible regarding his claim that Smith threw a gun into a yard while being chased by police.

The various statement's by appellant's trial counsel were a far cry from appellant's argument now that "[t]rial counsel proposed to demonstrate corruption bias by eliciting that Officer Williams lied in his *Gerstein* affidavit, thus acting to obstruct the discovery of truth by manufacturing or suppressing his own testimony."[3] Given the various statements by counsel, I believe the trial court cannot be faulted for limiting counsel's questioning in the way the court did with respect to what the court fairly regarded as a "speculative" theory.[4] Further, for the

---

[3] As Judge Ferren's opinion acknowledges, defense counsel may argue that there is "a dent in [a witness's] veracity — his credibility," *ante* at 31, and that there are inconsistencies between a witness's account of a "frenzied event" and the account given by other individuals, *ante* at 27, without thereby necessarily arguing that the witness has the propensity to lie that inheres in a claim of corruption bias.

[4] I read the court's statements in its ruling denying appellant's motion for a new trial as confirmation that counsel's argument led the court to understand that

(continued . . .)

reasons Judge Ferren's opinion explains, the IAD report, which the court reviewed, did not suggest a basis for the theory of corruption bias that appellant now advances.

MCLEESE, *Associate Judge*, dissenting: The opinion for the court holds that the trial court permissibly precluded cross-examination of Officer Damien Williams about whether Officer Williams made false statements in a sworn affidavit in connection with an unrelated matter. I respectfully dissent.

**I.**

The opinion for the court lays out the evidence at trial and the procedural context of the ruling at issue. *Ante* at 3-10. I agree that Mr. Smith adequately

---

(. . . continued)

counsel was pursuing a theory of collusion bias. The court stated at page 14 of its order that it "did allow counsel to pursue a corruption bias theory although the theory was mostly speculative." "Speculative" was the word the court had used during the proceedings on December 18 in response to defense counsel's collusion theory. The court explained that there was not "support in the record for allowing [counsel] to use the claim of how all the officers in the two separate cases that are not related are backing each other up," but, nevertheless, noted that counsel had made his point in cross-examining Officer Couch and also said that it would permit the defense to examine Officer Couch again.

preserved a challenge to that ruling. *Ante* at 16-17. I do not agree, however, with the court's holding that the ruling was permissible. *Ante* at 17-37.

The Confrontation Clause of the Sixth Amendment "guarantees a defendant in a criminal case the right to confront witnesses against him." *Longus v. United States*, 52 A.3d 836, 849 (D.C. 2012) (internal quotation marks omitted). That right is violated if the trial court "precludes the defense from pursuing a line of examination that is necessary to enable the jury to fully evaluate the witness's credibility." *Id.* at 850-51.

Mr. Smith sought to cross-examine Officer Williams about an unrelated incident in which Officer Williams arrested a man named Antwann Barkley. Mr. Smith contended that Officer Williams's sworn statements about the incident demonstrated Officer Williams's corruption bias, *i.e.*, that Officer Williams had shown a "willingness to obstruct the discovery of the truth by manufacturing or suppressing testimony or otherwise to thwart the ascertainment of truth in a judicial proceeding." *Coates v. United States*, 113 A.3d 564, 572 (D.C. 2015) (internal quotation marks omitted). Such conduct "bears directly on the veracity of the wrongdoer in testifying at a trial." *Longus*, 52 A.3d at 852 (internal quotation

marks omitted); *cf. In re C.B.N.,* 499 A.2d 1215, 1219 (D.C. 1985) ("The willingness to testify falsely goes to the core of the witness'[s] credibility . . . .").

We have held that an attorney seeking to cross-examine a witness about corruption bias "need only proffer some facts which support a genuine belief that the witness is biased in the manner asserted or, lacking such facts, at least a well-reasoned suspicion of bias rather than an improbable flight of fancy." *Coates*, 113 A.3d at 575 (internal quotation marks, brackets, and footnote omitted); *cf. Moore v. United States*, 114 A.3d 646, 655 (D.C. 2015) ("[T]he requirement of a reasonable factual foundation is a fairly lenient one. It simply calls for a credible good faith proffer of facts supporting a genuine belief or well-reasoned suspicion[,] . . . [which] may be based on plausible factual allegations . . . .") (internal quotation marks and footnote omitted).

The trial court has discretion to impose reasonable limits on cross-examination. *See, e.g.*, *Brown v. United States*, 683 A.2d 118, 124 (D.C. 1996) (cross-examination may be restricted "within reasonable limits to avoid such problems as harassment, prejudice, confusion of the issues, the witness'[s] safety, or interrogation that is repetitive or only marginally relevant") (internal quotation marks omitted). Nevertheless, the Confrontation Clause precludes limits on cross-

examination that "keep[] from the jury relevant and important facts bearing on the trustworthiness of crucial testimony." *Coates*, 113 A.3d at 573 (internal quotation marks omitted); *see also Hagans v. United States*, 96 A.3d 1, 31 (D.C. 2014) (trial court may not "preclude a meaningful degree of cross-examination that allows the defense to pursue the proposed line of cross-examination in sufficient depth to elicit the nature and extent of the witness's bias") (internal quotation marks omitted).

Under this framework, I conclude that the trial court erred in precluding cross-examination of Officer Williams on the theory that Officer Williams intentionally made false statements in a sworn affidavit about Mr. Barkley's arrest. The United States has not disputed that submitting an intentionally false affidavit would demonstrate corruption bias. Nor has the United States adequately disputed that Mr. Smith was required to demonstrate only a "well-reasoned suspicion" in order to have a sufficient factual basis to cross-examine Officer Williams about corruption bias. It was not until oral argument that the United States advanced the argument that there is "tension" between the "well-reasoned suspicion" standard this court applied in cases such as *Coates* and the approach taken in cases such as *Sherer v. United States*, 470 A.2d 732, 738-39 (D.C. 1983) (upholding trial court's preclusion of cross-examination of witness about witness's alleged perjury in

unrelated trial, because defense counsel's proffer of proof of prior perjury was conclusory and contested by United States); *see also Roundtree v. United States*, 581 A.2d 315, 321 (D.C. 1990) ("Where an accused seeks to impeach the credibility of a witness by offering evidence that the witness has made a false claim under similar circumstances, the confrontation clause mandates that the trial court give defendant leave to cross-examine about the prior claim only where it is 'shown convincingly' that the prior claim is false.") (citing *Sherer*). This court generally will not consider arguments made for the first time at oral argument, *see, e.g.*, *Scott v. Burgin*, 97 A.3d 564, 565 n.2 (D.C. 2014), and I therefore would decide this case under the "well-reasoned suspicion" standard.

In my view, the information proffered by defense counsel at trial sufficed to permit defense counsel to plausibly argue that Officer Williams's sworn affidavit about Mr. Barkley's arrest was knowingly false. According to the affidavit, Officer Williams "began to redirect" Mr. Barkley "when [Mr. Barkley] began shoving Officer Williams," at which point Mr. Barkley adopted a fighting stance and approached Officer Williams. Also according to the affidavit, it was at that point that Officer Williams struck Mr. Barkley. In contrast, defense counsel proffered information indicating that Mr. Barkley had not taken any threatening actions at the time that Officer Williams struck Mr. Barkley. Specifically, defense

counsel pointed to: (1) Mr. Barkley's account of the incident as reflected in the IAD Report, which states that Mr. Barkley had been trying to photograph the incident when an officer knocked his cell phone out of his hand and someone punched him in the face from behind; and (2) statements by Mr. Barkley's attorney that three witnesses disputed Officer Williams's account and that video footage from Mr. Barkley's cell phone was inconsistent with the police version that Mr. Barkley dropped his cell phone and assumed a fighting stance.

The information proffered by defense counsel did not definitively establish that Officer Williams intentionally submitted a false affidavit, nor did it necessarily demonstrate that Officer Williams probably did so. But the proffered information did reasonably support the line of cross-examination that defense counsel sought to undertake. *Cf., e.g.*, *Longus*, 52 A.3d at 853 (defense counsel provided adequate basis to support cross-examination of witness on corruption bias, where proffer "did not manufacture allegations of bias out of thin air," but instead relied on newspaper account and fact of "government's suspension and investigation" of witness) (internal quotation marks omitted).

The United States argues, however, that this court's cases have required the trial court to permit cross-examination as to a witness's alleged corruption bias

only where the government had concluded that the witness had in fact acted corruptly. That proposed limitation is not consistent with either our articulation or our application of the "well-reasoned suspicion" test. *See, e.g.*, *Longus*, 52 A.3d at 852-54 (finding that trial court erred in precluding questioning of detective on corruption bias, where detective was subject of pending investigation for allegedly coaching witnesses in another case but there was no indication that government had concluded that detective in fact had improperly coached witnesses).

In denying Mr. Smith's new-trial motion, the trial court expressed concern that permitting cross-examination about Mr. Barkley's arrest would have led to a "trial-within-a-trial" about that incident. Although that is a legitimate consideration, we have held that such considerations "cannot justify a curtailment [of bias cross-examination] which keeps from the jury relevant and important facts bearing on the trustworthiness of crucial testimony." *Coates*, 113 A.3d at 573 (internal quotation marks omitted).

For these reasons, I would hold that the trial court erred by precluding cross-examination of Officer Williams as to whether the sworn affidavit concerning Mr. Barkley's arrest was intentionally false. I am not persuaded by the contrary conclusion of the opinion for the court. First, the opinion for the court states that

the differences among the various accounts of Mr. Barkley's arrest are "minor" and therefore "do not necessarily indicate that someone is lying." *Ante* at 24, 27. I do not view the differences between Officer Williams's account and the defense proffer as minor. On Officer Williams's account, Mr. Barkley apparently made first physical contact, Mr. Barkley shoved Officer Williams, and Mr. Barkley took an aggressive fighting stance before Officer Williams struck Mr. Barkley. On the account proffered by the defense, Mr. Barkley apparently did not initiate physical contact and had taken no threatening actions before he was struck. The differences between those accounts are both stark and of critical significance. On Officer Williams's account, Mr. Barkley was guilty of assault on a police officer, but on the defense's account, Mr. Barkley was the victim of an unjustified use of force. It is true, as the opinion for the court notes, that the differences between the two accounts "do not *necessarily* indicate that someone is lying." *Ante* at 27 (emphasis added). But that is not the applicable standard, and the differences between the two accounts in my view provided an ample basis for defense counsel to cross-examine Officer Williams about whether Officer Williams was lying in the affidavit.

Second, the opinion for the court seems to weigh all of the information before the trial court, to determine how strongly that information considered as a

whole supported a conclusion that Officer Williams had intentionally made false statements in the affidavit. *Ante* at 29-32. That is not our function, nor was it the function of the trial court. Rather, the proposed cross-examination should have been permitted as long as defense counsel proffered "some facts" supporting a "genuine belief" or "well-reasoned suspicion." *Coates*, 113 A.3d at 575 (internal quotation marks omitted). As we have explained, that "standard is a fairly lenient one. Because of the central role that bias cross-examination plays in a criminal trial, the court must accord such cross-examination wide latitude and must not unduly restrict it. . . . [C]onsistent with the exploratory nature of cross-examination and the leniency of the foundation requirement, the proffer need not be particularly compelling." *Blades v. United States*, 25 A.3d 39, 43 (D.C. 2011) (brackets, ellipses, citation, and internal quotation marks omitted); *cf., e.g.*, *Scull v. United States*, 564 A.2d 1161, 1164 (D.C. 1989) ("[W]here counsel has information from her own client, which she does not know to be false and which is not inherently incredible, she has a sufficient good-faith basis for the proposed cross-examination.") (internal quotation marks omitted).

**II.**

Mr. Smith argues that the preclusion of corruption-bias cross-examination in this case requires reversal under the constitutional harmless-error standard of *Chapman v. California*, 386 U.S. 18, 24 (1967) (to demonstrate harmlessness of constitutional error, government must "prove beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained"). The United States did not dispute in its responsive brief that the *Chapman* standard applies. Although the United States did contend at oral argument that this court should instead apply the harmless-error standard applicable to non-constitutional errors, that argument came too late. *Scott*, 97 A.3d at 565 n.2. I therefore would apply the *Chapman* standard. *See, e.g.*, *Longus*, 52 A.3d at 854 (applying *Chapman* standard where trial court erroneously precluded defense from cross-examining witness about corruption bias).

I cannot say that the preclusion of corruption-bias cross-examination in this case was harmless beyond a reasonable doubt. "[C]ross-examination seeking to ferret out bias takes on enhanced significance where the credibility of the key government witness is in issue." *Cunningham v. United States*, 974 A.2d 240, 245

(D.C. 2009) (internal quotation marks omitted). The government's evidence connecting Mr. Smith to the handgun consisted almost exclusively of the testimony of two officers. Officer Williams was a key government witness, because only he testified about the retrieval of the handgun. The government emphasized Officer Williams in its opening statement and closing argument. *Cf. Porter v. United States*, 37 A.3d 251, 261 (D.C. 2012) ("As we have frequently observed, a prosecutor's emphasis on certain evidence is at least a highly relevant measure of the prejudicial impact of that evidence.") (internal quotation marks omitted). On cross-examination, Officer Williams gave seemingly evasive responses to defense counsel's questioning about whether the punch that broke Mr. Barkley's jaw was an approved defensive maneuver, whether the pending investigation involved alleged excessive force, whether Officer Williams was removed from his usual duties, and whether he was aware of the severity of the potential consequences of the investigation.

The remaining evidence against Mr. Smith was not overwhelming. The on-site photographs of the handgun were taken by Officer Williams on his cell phone, rather than by crime-scene personnel. Officer Williams and Officer Couch both testified to seeing Mr. Smith throw the handgun over the fence with his left hand, but the parties stipulated to evidence suggesting that Mr. Smith was in fact right-

handed. No corroborative physical evidence, such as fingerprints or DNA, identified Mr. Smith as possessing the handgun. Moreover, defense counsel also attempted to impeach Officer Couch's testimony, by suggesting that Officer Couch had unjustifiably injured Mr. Smith in the course of effectuating the arrest in this case.

Because the trial court precluded the cross-examination at issue, we cannot be sure what would have happened at trial if the cross-examination had been permitted. Nevertheless, the United States bears the "heavy burden" of demonstrating beyond a reasonable doubt that the precluded cross-examination would not have affected the verdict in this case. *Coleman v. United States*, 948 A.2d 534, 553 (D.C. 2008). I conclude that the United States has not carried that burden. *Cf., e.g.*, *Longus*, 52 A.3d at 841-42, 853-54 (error in limiting cross-examination of detective about allegations that detective had improperly coached witnesses was not harmless under *Chapman* standard; cross-examination could have aided defense efforts to impeach government's principal witness at trial); *Coles v. United States*, 36 A.3d 352, 359-60 (D.C. 2012) (error in curtailing cross-examination of key government witness at trial about alleged collusion reflecting corruption not harmless beyond reasonable doubt; court could not say "that the defendant would have been convicted without the witness'[s] testimony, or . . . that

the restricted line of inquiry would not have weakened the impact of the witness'[s] testimony") (internal quotation marks omitted). I therefore would vacate the judgment and remand for further proceedings.